O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| American Trucking Associations, Inc., | ) | Case No. CV 08-4920 CAS (CTx) |
| | ) | **ORDER GRANTING IN PART AND** |
| | ) | **DENYING IN PART PLAINTIFF'S** |
| Plaintiff, | ) | **MOTION ON REMAND FOR** |
| | ) | **ENTRY OF PRELIMINARY** |
| vs. | ) | **INJUNCTION OF COUNTS I AND** |
| | ) | **II OF COMPLAINT** |
| | ) | |
| The City of Los Angeles, et al. | ) | |
| Defendants. | ) | |
| | ) | |
|_____ | ) | |

**I.     Introduction and Background**

Defendant City of Los Angeles owns and operates the Port of Los Angeles (sometimes referred to herein as "POLA").  Compl. ¶ 12.  Defendant City of Long Beach owns and operates the Port of Long Beach (sometimes referred to herein as "POLB").  Compl. ¶ 12.  The Port of Los Angeles and the Port of Long Beach ("the Ports") form a single contiguous port area along San Pedro Bay in Los Angeles County.  Authority to manage the assets of the port and craft rules governing port-related activities in each city is invested in defendants Board of Harbor Commissioners of the City of Los Angeles and

Board of Harbor Commissioners of the City of Long Beach.  Compl. ¶ 8.

On December 7, 2007, the California Air Resources Board adopted rules to limit the emissions from diesel trucks providing drayage services at California ports.  Compl. ¶ 26.  Around this same time, the Ports developed a Clean Air Action Plan ("CAAP").  Included in the CAAP was the Clean Trucks Program, a multi-faceted program designed to reduce the emissions of trucks providing drayage services to the Ports.

On March 20, 2008, defendant Los Angeles Harbor Board adopted an order which provides that "beginning October 1, 2008, at 8:00 am, no Terminal Operator shall permit access into any Terminal in the Port of Los Angeles to any Drayage Truck unless such Drayage Truck is registered under a Concession from the Port of Los Angeles . . ."  Compl. ¶ 19.  On February 19, 2008, defendant Long Beach Harbor Board similarly mandated that drayage trucks would be required to hold a Concession agreement with the City of Long Beach in order to enter the Port of Long Beach beginning on October 1, 2008.  Compl. ¶ 22.

On July 28, 2008, plaintiff American Trucking Associations, Inc. ("ATA") filed the complaint in this action against defendants City of Los Angeles, Harbor Department of the City of Los Angeles, and Board of Harbor Commissioners of the City of Los Angeles (collectively "Los Angeles defendants"), and City of Long Beach, Harbor Department of the City of Long Beach, and Board of Harbor Commissioners of the City of Long Beach (collectively, "Long Beach defendants").  The first and second claims asserted in the complaint allege that the Los Angeles and Long Beach Concession agreements are preempted by the Supremacy Clause of the United States Constitution and the Federal Aviation Administration Authorization Act of 1994 ("the FAAA Act").  The third claim alleges that the Concession agreements are preempted because they place an undue burden on and discriminate against the right of plaintiff motor carriers to engage in interstate commerce.

On July 30, 2008, ATA moved for a preliminary injunction pursuant to the first and second claims for relief restraining implementation of the Ports' mandatory

Concession agreements.  On September 9, 2008, this Court denied ATA's motion for a preliminary injunction.  See Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 577 F. Supp. 2d 1110 (C.D. Cal. 2008).  The Court found that ATA would likely demonstrate that the Concession agreements "related to a price, route, or service" of motor carriers, which would generally render them preempted under the FAAA Act.  Id. at 1118; See 49 U.S.C. § 14501(c)(1).  However, the Court held that ATA was nevertheless unlikely to succeed on the merits, because the Concession agreements likely fell under the FAAA Act's statutory "safety exception."  Id. at 1125; See 49 U.S.C. § 14501(c)(2)(A) (preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles . . .").[1]  The Court also found that ATA had not shown a likelihood of irreparable harm, and that the balance of the hardships and the public interest weighed in favor of denying the injunction.  Id. at 1126-1128.  On March 20, 2009, in Am. Trucking Ass'ns Inc. v. City of Los Angeles, 559 F.3d 1046 (9th Cir. 2009) (hereinafter "Am. Trucking") the United States Court of Appeals for the Ninth Circuit reversed the Court's September 9, 2008 order and remanded the case to this Court for further proceedings.

On April 3, 2009, ATA filed a motion on remand for entry of preliminary injunction on counts I and II of the complaint.  On April 13, 2009, the Los Angeles defendants and the Long Beach defendants each filed oppositions. Also on April 13, 2009, intervenors the Natural Resources Defense Council, Sierra Club, and Coalition for

---

[1] The safety exception provides in full that the preemption provision

> shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C. § 14501(c)(2)(A)

1  Clear Air Inc. filed an opposition. [2]  ATA filed a reply on April 17, 2009.  A hearing was

2  held on April 27, 2009.  After carefully considering the arguments set forth by the parties,

3  the Court finds and concludes as follows.

4  **II.    The Ninth Circuit Decision**

5       In Am. Trucking, 559 F.3d 1046, the Ninth Circuit began by noting the standard

6  for preliminary injunction under Winter v. Natural Resources Def. Council, Inc., 129 S.

7  Ct. 365, 374 (2008).  Specifically, under Winter, "[a] plaintiff seeking a preliminary

8  injunction must establish that he is likely to succeed on the merits, that he is likely to

9  suffer irreparable harm in the absence of preliminary relief, that the balance of equities

10  tips in his favor, and that an injunction is in the public interest."  Id.

11       The Ninth Circuit then turned to the likelihood of success on the merits prong, and

12  first affirmed the Court's determination that the Los Angeles and Long Beach Concession

13  agreements likely relate to "price, route or service" of motor carriers under the FAAA

14  Act.  Am. Trucking, 559 F.3d at 1053 ("that the Concession agreements relate to prices,

15  routes or services of motor carriers can hardly be doubted").  The Ninth Circuit then

16

17       [2] In their brief, intervenors do not address the provisions of the Concession
18  agreements specifically, but instead argue generally that an injunction enjoining the
    implementation of the Concession agreements will "stop cold the clean up of port trucks."
19  Intervenors' Opp'n at 1.  Specifically, intervenors argue:

20            Both the Port of Los Angeles and the Port of Long Beach require that,
21            to obtain an incentive payment or subsidy for clean trucks, a driver or
              trucking company must be a Port concessionaire.  Thus, if the
22            concession plans are put on ice, the flow of . . . money to purchase or
23            subsidize new trucks will come to a stop."

24  Intervenors' Opp'n at 1.

25       On April 13, 2009, intervenors also filed a request to cross-examine declarants Billy
26  Joe Patterson, Reid Wicker, and Gregory Owen at the April 27, 2009 hearing.  ATA filed
    an opposition on April 20, 2009.  On April 24, 2009, the Court denied intervenors' motion
27  to cross-examine declarants, because the Court determined that such cross-examination
28  would be outside of the scope of the Ninth Circuit's mandate.

examined the Concession agreements under the statutory safety exception to the FAAA Act, and found that "the record demonstrates that the Ports' concern was increasing efficiency and regulating the drayage market[,]" rather than motor vehicle safety.  Id. at 1056.  The Ninth Circuit thus found that "[i]t is rather clear that some, indeed many, of the provisions of the Concession agreements are not likely to live in the light cast by that strobe."  Id. at 1055.  As discussed in more detail in Part III.D, infra, the Ninth Circuit specifically discussed certain provisions of the Concession agreements that it considered particularly unlikely to survive preemption under the safety exception.        The Ninth Circuit next examined the remaining Winter factors, and concluded that ATA had demonstrated a likelihood of irreparable harm, and that "the balance of the equities and the public interest do weigh in favor of a preliminary injunction in this case as to at least portions of the Concession agreements."  Id. at 1060.

The Ninth Circuit also noted that the Concession agreements contained a severance provision, and stated that it was "not prepared to hold that every provision must be preempted."  Id. at 1060.  The Ninth Circuit therefore remanded to this Court "for further consideration of the specific terms of each agreement and for the issuance of an appropriate preliminary injunction."  Id. at 1060.  However, the Ninth Circuit noted that "if major portions of the agreements are enjoined, it may not be practicable to leave the remaining portions standing." Id. at 1060, citing United States v. Manning, 527 F.3d 828, 840 (9th Cir. 2008) (statute had a savings clause, but because the "most significant" parts were excised, the whole was preempted); see also Nat'l Adver. Co. v. City of Orange, 861 F.2d 246, 250 (9th Cir. 1988) (partial invalidation of ordinance was appropriate based on the intent of the City and the fact that the remainder of the ordinance could still "function effectively").

## III.   DISCUSSION

The Court begins the analysis by addressing two of the arguments raised by ATA on remand, namely that: (1) Castle v. Hayes 348 U.S. 61 (1954) and its progeny, as well as Cal.Veh. Code § 34505.6(a), preclude the Ports from enforcing the Concession

1  agreements; and (2) the Concession agreements are duplicative of existing law and
2  therefore may not be enforced.

3      The Court then examines the scope of the safety exception, and turns to an inquiry
4  as to whether specific challenged provisions of the Concession agreement fall within it.
5  The Court first examines those provisions that were specifically addressed by the Ninth
6  Circuit in Am. Trucking, 559 F.3d 1046.  Subsequently, the Court will turn to provisions
7  that the Ninth Circuit did not specifically address.

8      **A.    Castle v. Hayes and Cal. Veh. Code § 34505.6(a)**

9      ATA argues that, regardless of whether or not the individual provisions of the
10  Concession agreements would fall within the safety exception, the Concession
11  agreements are nevertheless preempted in their entirety, because "states do not have the
12  ability to determine the operating rights of *motor carriers* engaged in interstate
13  commerce."  Mot. at 13.  As ATA did in its original motion for preliminary injunction,
14  ATA cites Castle, 348 U.S. 61, and similar cases to support this argument.  In Castle, the
15  Court held that under the Federal Motor Carrier Act, a state could not punish a motor
16  carrier for repeated violations of safety standards by suspending the motor carrier's right
17  to engage in interstate commerce over the state's roads.   Id. at 63-64.

18      In its September 9, 2008 order, the Court noted that Castle was decided forty years
19  before the passage of the FAAA Act and the safety exception, and involved a
20  significantly different factual scenario than the one at issue.  ATA argues here that the
21  Court should reconsider this finding, given that, in an amicus brief before the Ninth
22  Circuit, the United States cited Castle, which demonstrates, according to ATA, the case's
23  "continuing vitality."  Mot. at 14, n.14, citing *amicus curiae* of United States (McNatt
24  Decl. Ex. 2) at 9-10 (arguing that the Supreme Court has recognized that "comprehensive
25  federal regulation precludes state or local entities from 'exercising any veto power over'
26  interstate commerce service providers").

27      ATA also argues that California Vehicle Code confirms that a state has no
28  authority to suspend a motor carrier's interstate operations for safety violations, and that,

1   therefore, it cannot delegate this authority to the ports under the guise of safety

2   regulations.  Mot. at 14, citing Cal. Veh. Code § 34505.6(a) (stating that if the

3   Department of California Highway Patrol finds that a motor carrier has engaged in a

4   "constant failure" to maintain its vehicles "so as to justify a suspension or revocation of

5   the motor carrier's motor carrier permit" then "for interstate operators, the department

6   shall *recommend* to the Federal Motor Carrier Safety Administration that appropriate

7   administrative action be taken against the carrier . . .") (emphasis added).

8        Notwithstanding ATA's arguments, the Court notes that the Ninth Circuit's

9   holding did not disturb the Court's finding that Castle, 348 U.S. 61, is not controlling in

10  this action, and similarly declined to address the parties' arguments under the California

11  Vehicle Code.  For these reasons, as well as the reasons set forth in the Court's

12  September 9, 2009 order, the Court finds these arguments to be unpersuasive.

13       **B.      Whether Duplication of Other Legal Requirements Renders the**

14  **Concession Agreements Invalid**

15       It is undisputed by the parties that many of the provisions of the Concession

16  agreements – particularly those provisions dealing with the Drayage Truck Registry

17  ("DTR"), the federal Transportation Worker Identification Credential (TWIC), and other

18  federal and state safety and security standards and requirements – seek to enforce

19  compliance with requirements already imposed by federal and state law.

20       ATA argues that because many of the Concession agreements' provisions are

21  duplicative of federal and state standards already in effect, the Concession agreements

22  should be enjoined in their entirety.  ATA also argues that many of these existing federal

23  and state mechanisms, such as the DTR and the TWIC, allow the Ports to achieve all of

24  their safety needs without the implementation of Concession agreements.  See also Am.

25  Trucking, 559 F.3d at 1059 ("with or without the Concession agreements, many other

26  programs and laws designed to alleviate those problems are in existence and are not

27  challenged.  For example: The Drayage Truck Registry program, the Transportation

28  Worker Identification Credential program, the remainder of the Clean Trucks Program,

1    the Port Check program and the PierPass program would not be affected.")

2           The Los Angeles defendants, however, note that ATA has presented no authority

3    for the proposition that a safety-related provision falls outside of the FAAA Act's safety

4    exception if there is another mechanism in place for promoting the same safety goals.

5    Los Angeles Br. at 4, citing Ace Auto Body & Towing, Ltd. v. City of New York, 171

6    F.3d 765 ("preemption analysis does not insist upon a least restrictive means test"), cited

7    by Galactic Towing, Inc. v. City of Miami Beach, 274 F. Supp. 2d 1315 (S.D. Fla. 2002),

8    aff'd 341 F.3d 1249, 1321 (11th Cir. 2003) (finding a towing ordinance to be within the

9    safety exception and thus not preempted).[3]

10

11          [3] The Long Beach defendants also argue that ATA's argument is inconsistent with

12   49 U.S.C. § 31441, which provides that "[a] State may not enforce a State law or regulation

13   on commercial motor vehicle safety that the Secretary of Transportation decides under this
     section may not be enforced."  This provision requires a state promulgating laws or

14   regulations affecting commercial motor vehicle safety to submit the law to the Secretary
     of Transportation to review.  See 49 U.S.C. § 31141(b).  If the Secretary determines that

15   the state law or regulation has the same effect as a regulation prescribed by the Secretary,
     it may be enforced.  See 49 U.S.C. § 31141(c)(2).  A more stringent regulation may also

16   be enforced, unless the Secretary decides that the State law has no safety benefit, is

17   incompatible with the Secretary's regulation, or enforcement would cause an unreasonable

18   burden on interstate commerce.  See 49 U.S.C. § 31141(c)(4).  The purpose of 49 U.S.C.
     § 31441 *vis-a-vis* the safety exception is that it

19

20                 affords the Secretary of Transportation a means to prevent the safety
                   exception from overwhelming the lawmakers' deregulatory purpose. That

21                 provision authorizes the Secretary to void any 'State law or regulation on

22                 commercial motor vehicle safety' that, in the Secretary's judgment, 'has no
                   safety benefit . . . [or] would cause an unreasonable burden on interstate

23                 commerce.' . . .

24

25   City of Columbus v. Ours Garage & Wrecker Serv., Inc., 122 S. Ct. 2226, 2236-37 (2002).

26   The Long Beach defendants argue that 49 U.S.C. § 31441 therefore demonstrates that a
     safety regulation is not invalid *per se* just because it replicates existing federal law, unless

27   the Secretary finds that to be so.  Long Beach Opp'n at 9.

28                                                                      (continued...)

1   The Los Angeles defendants further argue that, without the Concession
2   agreements, the Ports in fact cannot enforce their safety goals.  In this regard, the Los
3   Angeles defendants submit the declaration of John M. Holmes, Deputy Executive
4   Director for Port Operations for the Port of Los Angeles.  See Holmes Decl. ¶ 21.  Los
5   Angeles defendants argue that "[i]t is the Concession agreement that gives POLA the
6   enforcement mechanism to restrict [motor carriers] from POLA property that are not, for
7   example, in compliance with truck safety regulations . . . It also gives POLA the ability to
8   inspect concessionaire records demonstrating that drivers are TWIC approved and that
9   the applicable safety and security regulations and laws are followed."  Holmes Dec. ¶ 22;
10  see also Holmes Decl. ¶ 15 ("A direct relationship with [licensed motor carriers], the
11  entities directly coordinating drivers, trucks, and cargo, is essential if POLA is to assure
12  itself of the safe and secure operation of drayage.  There is no other way that I am aware
13  of for POLA to obtain a direct relationship with [licensed motor carriers] other than
14  through a Concession agreement.  It is the Concession agreement structure that gives
15  POLA the ability to collect reliable information, correlate the various relevant pieces of
16  information, and apply the information in a timely way to address the drayage security
17  issues that POLA faces").

18      The Court agrees with the Los Angeles defendants that the mere fact that certain
19  provisions of the Concession agreements require compliance with already existing

20  ───────────────

21      [3](...continued)
        The Long Beach defendants further argue that the Court should stay this proceeding
22  so that the Federal Motor Carrier Safety Administration of the Department of
    Transportation may review the elements of the Concession agreement under 49 U.S.C. §
23  31141(c)(4).  By contrast, it is ATA's position that § 31141 supplements, but does not
24  substitute for, § 14501(c)(1) and therefore review is not a necessary prerequisite to the
    instant proceedings. Reply at 24, citing United States Br. at 18 ("The Secretary's authority
25  [under 49 U.S.C. § 31141(c) is supplemental to – not a substitute for – the general
26  preemption provision").  The Court agrees with ATA that there is no indication in the
    statutory scheme that such a review is a prerequisite to this Court's determination of
27  whether the provisions of the Concession agreements are preempted. Therefore, the Court
28  finds that a stay is not warranted.

obligations under federal and state law does not lead to the conclusion that the Concession agreements cannot fall within the safety exception.  The Holmes declaration provides support for defendants' argument that the Concession agreements are a necessary mechanism by which the Ports can ensure that trucks entering the Ports comply with the various safety-related provisions of federal and state law.  For example, defendants note that the Concession agreements provide a mechanism to promote compliance with the federal TWIC program, by allowing the Ports to confirm that each truck driver accessing the Ports has a TWIC, and that no trucker accessing the Ports is using the TWIC of another.  Holmes Decl. ¶ 7.g.  Similarly, the Ports note that Concession agreements provide a mechanism by which the Ports can ensure that each truck accessing the Ports has its own Radio Frequency Identification Device ("RFID"), and that the same RFID is not being used in multiple trucks.  Holmes Decl. ¶ 7.g. Therefore, provisions of the Concession agreement may be "genuinely responsive to safety," even where they overlap with existing legal requirements, because they provide a unique enforcement mechanism for ensuring compliance with safety-related laws and regulations.  Therefore, the Court declines to enjoin the Concession agreements in their entirety on this basis.  Instead, the Court turns to the safety exception, in order to determine whether the specific provisions of the Concession agreements fall within the exception.[4]

---

[4] At oral argument, ATA also argued that the Concession agreements improperly allow the Ports to make discretionary determinations as to who may operate a truck at the Ports, and that such discretion will allow the Ports to exclude certain trucks, even where those trucks otherwise comply with the non-preempted safety-related requirements of the Concession agreements.  In response, the Los Angeles defendants noted that of the 847 motor carriers that have applied for Concession agreements, 847 have been granted, indicating that the Ports are not importing discretionary factors into the decision.  The Court finds that at this juncture, ATA's argument is speculative, because there is no indication that the Ports are using the Concession agreements to make discretionary decisions excluding certain motor carriers from the Ports.  Therefore, the Court will not

(continued...)

1

### C.   Scope of the Safety Exception

2

3   As the Court stated in its September 9, 2008 order, "[t]here is little case law

interpreting the limits of the safety exception on federal preemption."  Order at 18, citing

4   Tillison, 406 F.3d at 1129.  The United States Supreme Court has held that, in order to

5   fall within the safety exception, a statute, regulation, or provision must be genuinely

6   responsive to safety concerns.  City of Columbus v. Ours Garage and Wrecker Service,

7   Inc., 536 U.S. 424, 426 (2002).  In other words, a regulation does not fall under the safety

8   exception if it is an economic regulation under the guise of a safety regulation.  Id.  The

9   Supreme Court has also held that the "narrowest possible construction of the exception"

10  is "surely resistible," because the FAAA Act's preemption rule and the safety exception

11  "do not necessarily conflict."  Ours Garage, 536 U.S. at 441.  Instead, the safety

12  exception "seeks to save from preemption state power 'in a field which the States have

13  traditionally occupied.'"  Id.

14  In Am. Trucking, 559 F.3d at 1054, the Ninth Circuit noted that there is "no bright

15  line test for what is related to vehicle safety" and that the Court is required to ask whether

16  the regulator was "acting out of safety concerns."  Id., citing Tillison, 406 F.3d at 1129.

17  The Court held that "[i]t is not enough to say that the provision might enhance efficiency,

18  or reduce some kind of negative health effects. The narrow question, again, is whether the

19  provision is intended to be, and is, genuinely responsive to motor vehicle safety."  Id. at

20  1055. The Court therefore stated that "even if some kind of general public health

21  concerns are (or may be) involved in a statute or regulation . . . that alone does not bring

22  the regulation within the ambit of the motor vehicle safety exception."  Am. Trucking,

23  559 F.3d at 1054.  The Ninth Circuit noted:

24  _____

25  [4](...continued)
enjoin the Concession agreements in their entirety on this basis.  Moreover, in light of the

26  relief granted herein, it does not appear that the Ports are left with the unfettered discretion
about which ATA complains.  The Court is willing to revisit these arguments at a later date

27  upon presentation of evidence that defendants are using the Concession agreements to

28  exclude trucks on preempted, non-safety related grounds.

1    On the other hand, regulation of tow truck services has been found to
2    be within the safety exception on the basis that the statutory
3    provisions were "designed to make the towing and removal of
4    vehicles safer." Tocher, 219 F.3d at 1051; see also Tillison, 424 F.3d
5    at 1104-05 (same). But an ordinance that required tow yards to be
6    within a one-mile radius of the police department was not genuinely
7    responsive to motor vehicle safety concerns. Loyal Tire, 445 F.3d at
8    148. On the contrary, despite its stated safety purpose, the provision
9    in question was designed to exclude out of town businesses from a
10   rotating tow list. Id. at 146.

11   Id. (also noting that in United States Parcel Serv., Inc. v. Flores-Galarza, 385 F.3d 9, 13
12   (1st Cir. 2004), statutes requiring motor carriers to "keep documents and records required
13   by the Treasury Department, pay license fees, submit copies of their corporate officers'
14   criminal records, and post a bond to secure payment of penalties imposed by the Treasury
15   Department" did not fall within the safety exception, and noting that some of the
16   provisions at issue in that case are "hauntingly similar" to those contained in the
17   Concession agreements.)

18   Other types of regulations that are similar to some of the Concession agreement
19   provisions have been upheld under the safety exception. See, e.g, Cole v. City of Dallas,
20   314 F.3d 730 (5th Cir. 2002) (regulation conditioning wrecker driver's permit on clean
21   criminal history included within safety exception). Fife Enterprises v. Washington State
22   Patrol, 113 Wn. App. 1011 (Wash. App. 2002) (unpub.) ("[s]tate tow operator record
23   keeping requirements generally relate to safety and financial responsibility concerns for
24   purposes of exemption under [the safety exception]"); Ace Auto Body & Towing, Ltd. v.
25   City of New York, 171 F.3d 765 (2d Cir. 1999) (towing ordinance requiring licensing,
26   display of information, reporting, record keeping, disclosure of criminal history,
27   insurance, posting of bond by towing companies, and maintaining local storage and repair
28   facilities, fell within the safety exception); Hott v. City of San Jose, 92 F. Supp. 2d 996

(N.D. Cal. 2000) (holding that regulations requiring liability insurance, criminal background check, displaying of information, reporting, and record keeping were all within scope of safety exception); Galactic Towing, Inc. v. City of Miami Beach, 341 F.3d 1249 (11th Cir. 2003) (regulation requiring towing permit upheld under safety exception).

Many of ATA's arguments regarding the various provisions of the Concession agreements are premised on an argument that the safety exception is too narrow to include port "security" concerns.[5] Reply at 9, citing U.S.A. Amicus Brief at 13, n.5 (port security concerns do not fall within the safety exception). Specifically, ATA argues that port security is matter that is subject to federal regulation and is not a field that the states have traditionally occupied, which indicates that it does not fall within the ambit of the safety exception. Reply at 10, citing City of Columbus v. Ours Garage and Wrecker Service, Inc., 536 U.S. 424, 426 ("§ 14501(c)(2)(A) evinces a clear purpose to ensure that the preemption of States' economic authority over motor carriers of property not restrict the preexisting and traditional state police power over safety, a field which the States have traditionally occupied."); id. at 438 ("It is the expressed intent of §14501(c)(2)(A) that the preemption rule of § 14501(c)(1) not restrict the existing safety regulatory authority of a State.") (emphasis in original); H.R. Rep. No. 103-677 at 84 (1994) ("nothing in these new subsections [of the FAAA Act, including the safety exception] contains a new grant of Federal authority to a State to regulate commerce and nothing in

---

[5] In the Court's September 9, 2009 order, the Court stated

There does not appear to be any case law addressing the question of whether security concerns analogous to the concerns identified by the Ports fall within the safety exception. Some of the cases involving towing have, however, indicated that the safety exception does cover regulations that address safety concerns beyond pure motor vehicle operation safety. For example, the regulations on towing companies upheld in Tillison improved safety by reducing "dangerous confrontations" that might result from towing mistakes and 'protect[ed] the vehicle owner from being stranded at a dangerous time and location.' 424 F.3d at 1104.

1   these sections amends other Federal statutes that govern the ability of States to impose

2   safety requirements").

3        The Court is unpersuaded by ATA's argument that the fact that a provision may

4   have been implemented in part for "Port security" reasons takes that provision outside of

5   the scope of the safety exception.  Instead, pursuant to the Ninth Circuit mandate, the

6   Court examines the individual provisions of the Concession agreements in order to

7   determine whether the intent of the provision was "truly safety."  See Tillison, 406 F.3d

8   at 1129.

9        **D.    Concession Agreement Provisions Addressed by the Ninth Circuit**

10       The Court first examines provisions of the Concession agreements that were

11   specifically addressed by the Ninth Circuit in Am. Trucking, 559 F.3d 1046. Each of

12   these provisions is contained in Section 3 of the Concession agreements, under the

13   heading "Concession Requirements."

14       **A.    POLA Concession Requirement (d): Driver Hiring (Independent**

15       **Operator Phase Out)**

16       This provision of the Los Angeles Concession agreement provides in part "[d]river

17   Hiring. . . . Concessionaire shall be granted a transition period, as set forth in the schedule

18   below, by which to transition its Concession drivers to 100% Employee Concession

19   drivers by no later than December 31, 2013 ("Transition Period")."

20       The Ninth Circuit held that "the independent contractor phase-out provision is one

21   highly likely to be shown to be preempted."  Am. Trucking, 559 F.3d at 1056.

22   Specifically, the Ninth Circuit stated:

23           the Port of Los Angeles Concession agreement mandates the phasing

24           out of thousands of independent contractors (many or most of them

25           small businessmen who own their own trucks). In an attempt to

26           justify this, the Port argues that there are '[s]erious and longstanding

27           safety problems' because of 'unsafe, negligent or reckless driving'

28           that has subjected the Port to 'a risk of financial liability and moral

14

> culpability for failure to act to control actions by third parties.'
> Those concerns would allegedly be ameliorated because requiring
> employee drivers will provide 'control [to] the concessionaires as
> employers of their employee drivers to a degree not possible with
> casual or independent drivers.' We see little safety-related merit in
> those threadpaper arguments, which denigrate small businesses and
> insist that individuals should work for large employers or not at all.
> As it is, the record demonstrates that the Ports' primary concern was
> increasing efficiency and regulating the drayage market.

Id. at 1055-56.

Based on the holding of the Ninth Circuit, and because it appears that this provision is addressed to concerns unrelated to motor vehicle safety, the Court finds that ATA is likely to succeed on the merits in showing that the provisions of the POLA Concession agreement dealing with the independent operator phase-out are preempted under the FAAA Act, and do not fall within the scope of the safety exception.  Therefore, because the Ninth Circuit has also found that the irreparable harm, balance of hardships, and public interest factors also weigh in favor of an injunction, this provision must be enjoined.  See Winter, 129 S. Ct. At 374.

### 2.   POLA Requirement (d); POLB Requirement (e): Driver Hiring (Hiring Preferences)

The Los Angeles Concession agreement, Requirement (d) provides in pertinent part that "[c]oncessionaire shall give a hiring preference to drivers with a history of providing drayage services to the Port."  The Long Beach Concession agreement (e) provides in part "[d]river Hiring.  Concessionaire shall give a hiring preference to drivers with a history of providing drayage services in the port."

In Am. Trucking, 559 F.3d at 1056, the Ninth Circuit held that

> the job posting and experienced-drivers-first requirement in both
> Ports' Concession agreements have little or nothing to do with

1
2
3
4
5
6
7
8

> vehicle safety. Although those provisions might have some slight
> tendency to ensure that drivers have a proven safety record and can
> be trusted to conduct business at the Ports, it is likely that the Ports
> are imposing the requirements in order to force drayage carriers to
> hire certain preferred workers over others, on the theory that new
> drivers are not as reliable as old drivers. It is a rather blatant attempt
> to decide who can use whom for drayage services, and is a palpable
> interference with prices and services.

9
10
11
12

The Long Beach defendants nevertheless argue that this provision should not be enjoined, arguing that drivers "with more experience operating in and around the Ports can reasonably be expected to increase the likelihood of safe operations over otherwise equally-qualified inexperienced drivers." Long Beach Opp'n at 20.

13
14
15
16
17

Defendants fail to provide evidence to overcome the Ninth Circuit's conclusion that this provision, which addresses driver experience, does not fall within the safety exception. The Court is therefore constrained by the finding of the Ninth Circuit that the driver hiring provisions do not fall within the ambit of the safety exception, and the Court finds that these provisions are likely to be found preempted and must be enjoined.

18
19

### 3. POLA Requirement (n); POLB Requirement (o): Financial Capability

20

The Los Angeles Concession agreement, Requirement (n) provides:

21
22
23
24

> Financial Capability. Concessionaire shall demonstrate to the
> satisfaction of the Executive Director that it possesses the financial
> capability to perform its obligations under this Concession over the
> term of the Agreement.

25

The Long Beach Concession Agreement, Requirement (o) similarly provides:

26
27
28

> Financial Capability. With the exception of licensed motor carriers in
> good standing on June 1, 2008, all Concessionaires shall demonstrate to
> the satisfaction of the Executive Director that they possess the financial

1   capability to perform their obligations under this Concession over the term

2   of the Agreement.

3   The Long Beach defendants argue that this provision is related to safety, because

4   "[f]inancially sound carriers have resources to maintain vehicles in good repair and to

5   implement compliance protocols that ensure safety regulations are being followed."[6]

6   Long Beach Opp'n at 18.

7   However, in Am. Trucking, 559 F.3d at 1056, the Ninth Circuit stated, with

8   regard to these provisions:

9   it is not likely that the financial disclosure requirements in both Ports'

10   agreements could be justified under any conceivable safety rationale.

11   Those provisions require disclosures of annual reports, SEC filings,

12   balance sheets, income tax statements, and pending legal actions. The

13   Ports make no effort to explain how a motor carrier's financial viability

14   touches at all on the safety of the motor vehicle.

15   Based on the record before the Court, it cannot conclude that these provisions

16   are likely to fall within the safety exception.  Therefore, the Court finds an injunction

17   as to these provisions to be appropriate.

18   **d.   POLB Requirement (i): Driver Health Insurance**

19   The Long Beach Concession Agreement, Requirement (i) states that

20

21   [6] The Long Beach defendants also argue that motor carriers are already subject to

22   annual and quarterly financial reporting requirements under Federal law.  Long Beach

23   Opp'n at 17, citing 49 U.S.C. § 14123 (requiring annual financial and safety reports to be

filed with the Secretary of Transportation, as well as other period reports the Secretary may

24   require); 49 C.F.R. § 369 (governing annual reports by motor carriers).  Therefore, the

25   Long Beach defendants argue, the financial requirements as set forth by the Concession

agreements would not have any additional effect on motor carriers' "price, route, or

26   service," and, as a result, ATA cannot show a likelihood of success that they will be

27   enjoined.  Long Beach Opp'n at 18.  Based on the prior findings of this Court and the

decision of the Ninth Circuit, however, the Court finds that the provisions of the

28   Concession agreements likely relate to a "price, route, or service" of a motor carrier.

"[c]oncessionaire shall provide proof to the Port that drivers are duly notified of available health insurance programs, including programs identified by the Port."

The Long Beach defendants argue that this provision is related to safety, because drivers who obtain health insurance and have access to medical care will invariably be healthier than those who do not receive such care.  Long Beach Opp'n at 22, citing Public Citizen v. FMCSA, 374 F.3d 1209, 1217 (D.C. Cir. 2004) ("[H]ealthy drivers presumably cause fewer accidents").[7]

The Ninth Circuit, however, stated that this provision "has no discernable safety purpose."  Am. Trucking, 559 F.3d at 1056.  Based on the Ninth Circuit's conclusion, and the absence of persuasive evidence to the contrary, the Court finds that this provision does not fall within the safety exception, and therefore is likely preempted.

**5.      POLA Requirement (f) and POLB Requirement (f):**
**Compliance with Truck Routes and Parking Restrictions**

The Los Angeles Concession agreement contains the following provision regarding truck routes and parking restrictions:

> Compliance with Truck Routes and Parking Restrictions.
> Concessionaire shall submit for approval by the Concession
> Administrator, a parking plan that includes off street or lawful on-
> street parking locations for all Permitted Trucks.  Concessionaire shall
> ensure that all Permitted Trucks remain in compliance with the
> parking plan and all state and local laws and Port tariffs regarding: (1)
> parking and stopping; and (2) truck routes and permit requirements for

---

[7] The Long Beach defendants also argue that this provision is unlikely to affect the "price, route or service" of a motor carrier, because it does not require motor carriers to provide insurance, but rather only requires motor carriers to inform drivers that health insurance may be available using materials prepared by the Port.  Long Beach Opp'n at 22. Based on the prior findings of this Court and the decision of the Ninth Circuit, however, the Court finds that the provisions of the Concession agreements likely relate to a "price, route, or service" of a motor carrier.

hazardous materials, extra-wide, over-height and overweight loads.

The Long Beach provision is substantially similar:

> Compliance with Truck Routes and Parking Restriction. Concessionaire
> shall submit for approval by the Concession Administrator, an off-street
> parking plan that includes off-street parking location(s) for all Permitted
> Trucks. Concessionaire shall ensure that all Permitted Trucks are in
> compliance with on-street parking restrictions by local municipalities.
> Permitted Trucks not in service shall be staged off public streets and away
> from residential districts. Concessionaire shall ensure that Permitted
> Trucks, adhere to any truck routes specified by local and state authorities
> or the Port, including routes and permit requirements for hazardous
> materials, extra-wide, over-height and overweight loads.

The Ninth Circuit addressed these requirements, finding that:

> it is likely that the on-street parking ban in the Port of Los Angeles
> Concession Agreement is not genuinely responsive to safety. While
> restrictions on parking could be responsive to the safety of drivers
> and individuals in the surrounding neighborhoods in some sense
> (though it is not clear how), the Port of Los Angeles bans trucks from
> parking legally on streets where other trucks are free to park. Thus,
> any potential safety rationale for restricting on-street parking is
> seriously undermined, and it is likely that this provision would not
> withstand scrutiny. Similarly, just how the Port of Long Beach can
> set out to regulate compliance with parking and truck routes which
> are not on Port property is a bit of a mystery.

Am. Trucking Ass'n, 559 F.3d at 1056-1057.

ATA also argues that parking within the borders of the Ports can be regulated
without a Concession agreement, and that there is "no genuine safety rationale to
condition motor carriers' right to enter the Port on parking compliance by individual

trucks either on or off Port property."  Mot. at 6-7.  The Long Beach defendants, however, argue that the submission of a parking plan unquestionably ensures the safety of motor carriers as well as the public, particularly with regard to motor carriers transporting hazardous materials and over-sized loads.  Long Beach Opp'n at 21.

Based on the arguments of the parties and the holding of the Ninth Circuit, it appears that the parking provisions contained within the Concession agreements are insufficiently related to motor vehicle safety so as to fall within the safety exception. Therefore, the Court finds that these provisions are likely to be preempted, and that they must be enjoined.

> **D.**  **Remaining Concession Agreement Provisions not Specifically Addressed by the Ninth Circuit**

The Los Angeles defendants argue that, if the five provisions that the Ninth Circuit found to be objectionable are enjoined, the remaining provisions should not be enjoined, regardless of whether they fall within the safety exception.  Specifically, the Los Angeles defendants argue that if the five objectionable provisions are enjoined, ATA cannot show that its members will suffer irreparable injury as a result of the implementation of the remaining provisions of the Concession agreements, or that the balance of hardships and public interest weighs in ATA's favor.  Los Angeles Opp'n at 17; see also Long Beach Opp'n at 23.  In other words, defendants urge the Court to revisit the Ninth Circuit's findings on irreparable harm, balance of hardships, and public interest in light of the effect of an injunction of the objectionable provisions. Los Angeles Opp'n at 17; see also Long Beach Opp'n at 23 ("this Court has full authority to assess anew ATA's showing of irreparable harm, to strike the balance of the equities as favoring or disfavoring the issuance of a preliminary injunction, and to gauge the public interest").

Specifically, defendants argue that if the provisions to which the Ninth Circuit objected are enjoined, the Concession agreement would not place any additional burdens on motor carriers other than (1) burdens associated with the environmental and

security aspects of the Clean Trucks Program, which ATA states that it does not challenge, or (2) burdens already imposed by federal and state law. Los Angeles Opp'n at 18. Therefore, defendants argue, there can be no irreparable harm. Los Angeles Opp'n at 18; see also Long Beach Opp'n at 23. Furthermore, the Los Angeles defendants argue that if the few objectionable provisions are enjoined, the balance of hardships tips in favor of non-injunction of the remaining provisions, because the remaining aspects of the Concession agreements do not harm ATA, but are necessary to enforce the Ports' Clean Trucks Program and security goals. Los Angeles Mot. at 18. Defendants also argue that because many of the remaining provisions merely enforce pre-existing federal and state law, the Concession agreements further the public interest. Long Beach Opp'n at 24.

The Long Beach defendants also argue that the provisions that only require compliance with existing laws and regulation are not preempted by the FAAA Act at all, because they have no effect on "price, route, or service" of motor carriers. Long Beach Opp'n at 13, citing Californians for Safe & Competitive Dump Truck Transp. v. Mendonca, 152 F.3d 1184, 1188 (9th Cir. 1998) ("state regulation in an area of traditional state power having no more than an indirect, remote, or tenuous effect on a motor carriers' prices, routes, and services are not preempted.").

Based on the prior findings of this Court and the decision of the Ninth Circuit, the Court finds that the provisions of the Concession agreements likely relate to a "price, route, or service" of a motor carrier.

Furthermore, the Court is mindful of the fact that enjoining the particular provisions singled out by the Ninth Circuit could alter the calculus of irreparable harm, the balance of the hardships, and the public interest in this case. As set forth above, the Ninth Circuit mandate clearly requires the Court in this case to consider the individual provisions of the Concession agreements to determine whether they fall within the

1  safety exception and whether they should be enjoined.[8]  Therefore, the Court will

2  consider the <u>Winter</u> factors in determining whether individual provisions should be

3  enjoined.  <u>See</u> <u>Winter</u>, 129 S. Ct. at 374.

4      1.      **POLA Requirement (a); POLB Requirement (b): Licensed**

5              **Motor Carrier**

6  Los Angeles Requirement (a) and Long Beach Requirement (b) provide that

7  "[c]oncessionaire must be a licensed motor carrier in good standing" and in compliance

8  with requirements of a valid license/permit under applicable state or federal permitting

9  regimes.

10  ATA does not address this provision specifically in its moving papers.  The Los

11  Angeles defendants argue that "[i]t is imperative that the Port be allowed to restrict

12  access to its property to only those [licensed motor carriers] that are properly licensed

13  and permitted if the bare minimum of safety and security goals is to be met."  Holmes

14  Dec. ¶ 17.a.

15  The Court concludes that defendants have sufficiently demonstrated that these

16  provisions are likely to fall within the safety exception.  Specifically, by ensuring that

17  drayage carriers who may pose a significant safety risk – i.e., those who have not met

18  necessary federal and state licensing and permit requirements – do not access the Ports,

19  these provisions protect the safety of all motor carriers operating motor vehicles at the

20  Ports, as well as other individuals on Port property.  Therefore, these provisions are

21  unlikely to be preempted.

22      2.      **POLA Requirement (b); POLB Requirement (c): Permitted**

23

---

24          [8] Furthermore, the Court notes that the Ninth Circuit found, that "constitutional

25  violation alone, coupled with the damages incurred, can suffice to show irreparable harm."
    <u>See</u> <u>Am. Trucking</u>, 559 F.3d at 1059.  This holding indicates that requiring motor carriers

26  to comply with provisions that are likely to be preempted may, in and of itself, constitute

27  irreparable harm, assuming that such provisions would inflict monetary losses on motor
    carriers.

28

**Trucks**

Los Angeles Requirement (b) and Long Beach Requirement (c) require that concessionaires use "permitted trucks." Permitted trucks are those that comply with all of the terms of the Concession agreement.[9] Furthermore, to qualify as a permitted truck, "all Drayage Trucks providing Drayage services operating under [the] Concession shall have required information entered into and kept updated in the Drayage Truck Registry. . ." POLA Concession agreement Requirement (b); POLB Concession agreement (c).

ATA states that it does not contest that the Ports may require valid carrier and driver identification information as part of the DTR mechanism, but argues that this requirement can be enforced through existing truck tariffs. However, as stated in Part II.B, *supra*, ATA has not presented any basis for a finding that because certain provisions of the Concession agreements may require compliance with already existing obligations under federal and state law, they necessarily fall outside of the scope of the safety exception. Therefore the Court declines to enjoin these provisions on this basis alone. Instead, the Court turns to the question of whether the provisions are genuinely responsive to safety concerns.

The Los Angeles defendants argue that because ATA does not challenge the legality of the truck ban or the DTR in this suit, the Ports need not show how this Concession requirement genuinely relates to safety. Los Angeles Opp'n at 7. However, the Los Angeles defendants also argue that the provision is in fact related to safety. Los Angeles Opp'n at 7. Los Angeles defendants argue that:

> [w]hile the DTR tracks identifying information for driver and trucks and gives the Marine Terminal Operators ("MTOs") the ability to

---

[9] To the extent that a "permitted truck" is defined as a truck that complies with the provisions of the Concession agreements, for the purposes of this order, such a truck must only comply with the provisions of the Concession agreements that are found herein to fall within the safety exception and to be severable.

determine whether a drayage truck seeking entry onto Port property complies with the truck ban, it is the Concession agreements that provide the mechanism to enhance Port security and enforce the Ports' environmental goals by contractually allowing POLA to make one entity, the [licensed motor carrier], which is the entity coordinating drayage truck movements, wholly responsible for providing the DTR information and verifying its accuracy for each truck operating under its concession . . . Therefore, the Concession agreement's enforcement of the DTR requirement is directly related to Port security and safety.

Holmes Decl. ¶ 17.b.  The Long Beach defendants similarly argue that guaranteeing registration through a Concession agreement allows the Port to enforce safety requirements.  Long Beach Opp'n at 14.

The Court agrees with defendants that these provisions appear to be genuinely responsive to safety concerns.  Specifically, these provisions provide a mechanism by which the Ports can ensure that only drivers who are identified in the Drayage Truck Registry and who are in compliance with the non-preempted safety-related provisions of the Concession agreements enter Port property, which in turn protects the safety of all motor carriers operating vehicles on Port property, as well as other individuals present.  Therefore, these provisions are unlikely to be preempted.

### 3.     POLA Requirement (c); POLB Requirement (d): Driver Compliance

Los Angeles Requirement (c) and Long Beach Requirement (d) mandate that a concessionaire shall be responsible for the compliance and performance of its drivers or other personnel pursuant to the Concession agreement, and that the Port shall have no responsibility or liability in this regard.

The Los Angeles defendants argue that it would be difficult to enforce a truck security program if the Ports lack a direct relationship with the motor carriers who

provide drayage services, and if they do not have the ability to hold motor carriers accountable. Holmes Decl. ¶17.c. The Los Angeles defendants state that, for example, "requiring all trucks to be registered in the DTR means nothing if those who attempt to skirt the requirement by using a single RFID on multiple trucks can evade identification." Los Angeles Opp'n at 8. The Los Angeles defendants argue that the Concession agreements, and specifically the ability to hold licensed motor carriers accountable, is the mechanism by which they can enforce the safety measures.[10] Opp'n at 8.

ATA, however, argues that, to the extent these provisions require more than is required by existing law regarding motor carrier vicarious liability, these provisions are preempted for the same reason that the Los Angeles independent-operator phase out is preempted. With regard to the independent operator phase-out provision, the Ninth Circuit rejected defendants' arguments that safety concerns would be addressed by granting "control [to] the concessionaires as employers of their employee drivers to a degree not possible with casual or independent drivers." Mot. at 7; see Am. Trucking, 559 F.3d at 1056. ATA further argues that "[t]o the extent any safety concern may be implicated, any attempt to circumvent the DTR, TWIC, or RFID requirements can be detected and enforced while the driver and truck are on Port property, without imposing additional obligations" on motor carriers. Reply at 20.

The Court finds that this provision is likely to fall within the safety exception.

---

[10] The Long Beach defendants further argue that this requirement does not regulate "price, route, or service." Instead, the Long Beach defendants argue that this provision merely comports with Federal laws and regulations. Long Beach Opp'n at 14-15, citing 62 Fed. Reg. 16370, 16424 (Apr. 4, 1997) ("Carriers are liable for the actions of their employees. . . .Carriers 'permit' violations of the hours of service regulations by their employees if they fail to have in place management systems that effectively prevent such violations."); 49 U.S.C. § 31132(2) (employee includes "an operator of a commercial motor vehicle (including an independent contractor when operating a commercial motor vehicle"). For the reasons stated above, the Court concludes that the provisions at issue are related to a "price, route, or service" of motor carriers.

Unlike the independent operator phase-out, this provision appears to be "genuinely responsive to safety," in that it provides an enforcement mechanism by which the Ports can ensure compliance with the safety-related provisions of the Concession agreements.

### 4.    POLA Requirement (e); POLB Requirement (a): Clean Truck Tariff

Los Angeles Requirement (e) and Long Beach Requirement (a) require concessionaires to cause all of their trucks to comply with the Clean Truck Program.

ATA argues that this requirement is unrelated to the safety exception, and also unnecessary, because it is independently enforceable through the use of existing Port tariffs.  Mot. at 7.

The Los Angeles defendants argue that ATA has not challenged the Clean Truck Program itself as preempted, and that therefore this provision of the Concession agreement is unlikely to be preempted.  Los Angeles Opp'n at 8.

It does not appear that the Ports were "acting out of safety concerns" with regard to these provisions.  See Am. Trucking, 559 F.3d at 1054.  Indeed, the Ports have failed to advance any safety rationale for them.  Therefore, these provisions of the Concession agreements are likely to be preempted, and must be enjoined.

### 5.    POLA Requirement (g), and POLB (g):  Truck Maintenance

Los Angeles and Long Beach Requirement (g) requires concessionaires to prepare a maintenance plan for all trucks.  This provision further requires that:

> Concessionaire shall be responsible for vehicle condition and safety and shall ensure that the maintenance of all Permitted Trucks, including retrofit equipment, is conducted in accordance with manufacturer specifications.  Maintenance records for all Permitted Trucks shall be available for inspection by the Concession Administrator during business hours.

ATA argues that this provision is duplicative of obligations imposed by federal law regarding proper maintenance and inspection on motor carriers with respect to all

vehicles subject to their control.  Mot. at 8, citing 49 C.F.R.  § 396.3 (every motor carrier "shall systematically inspect, repair, and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles subject to its control."). However, as the Court has stated, it does not find this to be a basis to find that a provision is outside the scope of the safety exception, if the provision is genuinely responsive to safety concerns.

ATA further argues that the Concession agreements' maintenance requirements are primarily focused on pollution control, which do not meet the motor vehicle safety exception.  Mot. at 8.

The Los Angeles defendants argue that although this provision does improve the environmental profile of the truck, it is also geared specifically toward safety, because "[i]f routine maintenance, such as tire replacement and brake inspections, is not undertaken, motor carrier accidents occur more frequently and endanger those living near and working on the Ports."[11] Los Angeles Opp'n at 8; Holmes Decl. ¶ 17.e.

The Court agrees with defendants that, while these provision may certainly be responsive to environmental concerns, they are also "genuinely responsive to motor vehicle safety."  See Am. Trucking, 559 F.3d at 1055.  Requiring routine truck maintenance will no doubt help to ensure that drayage trucks are operating properly and safely, which will in turn likely prevent motor vehicle accidents.  Therefore, these provisions likely fall within the safety exception and should not be enjoined.

### 6. POLA Requirement (h) and POLB Requirement (h):

---

[11] The Long Beach defendants also argue that this provision is likely satisfied by a motor carrier's pre-existing compliance with Federal maintenance recordkeeping requirements under 49 C.F.R. § 396.3(a) (cited above) and 49 C.F.R. § 396.3(c) ("The records required by this section shall be retained where the vehicle is either housed or maintained for a period of 1 year and for 6 months after the motor vehicle leaves the motor carrier's control.").  Therefore, defendants argue, they cannot constitute an additional burden affecting the "price, route, or service" of a motor carrier.  Long Beach Opp'n at 15. For the reasons stated above, the Court concludes that the provisions at issue are related to a "price, route, or service" of motor carriers.

**Compliance with Truck Safety and Operations Regulations**

Los Angeles and Long Beach Requirement (h) provides that "[c]oncessionaire shall ensure that all Permitted Trucks are in compliance with all applicable existing regulatory safety standards."  The provision further requires concessionaires to "maintain and make available for inspection by the Concession Administrator, all records required for compliance with the Port's Clean Trucks Program and all existing regulatory programs . . . [including] driver qualifications, driver training, vehicle maintenance, safety inspection, controlled substances and alcohol testing and hours-of-service for all employee drivers and contractor drivers. . ."

ATA argues that this requirement makes motor carriers responsible "to maintain a laundry-list of records for all drivers and trucks, even if not otherwise required by California or federal safety regulations."[12]  Mot. at 8.  Furthermore, ATA argues that these provisions serve the Ports' administrative convenience, rather than safety.  Mot. at 8.  ATA argues that the Ports, however, may use tariff and regulatory powers to require trucks and drivers to be in compliance with safety and operational regulations while on Port property.  Mot. At 9.

The Los Angeles, defendants, however, argue that this provision has no other purpose besides safety, as it "ensures compliance with an already in-place regulatory

---

[12] ATA further argues that the Ports' authority is also subject to the limitations of Cal Veh. Code § 34623(a) ("The Department of the California Highway Patrol has exclusive jurisdiction for the regulation of safety of operation of motor carriers of property") and 49 U.S.C. § 31142(d) ("A periodic inspection of a commercial motor vehicle under the Government standards prescribed under subsection (b) of this section or a program described in subsection (c)(1)(B) or (C) of this section that is being enforced shall be recognized as adequate in every State for the period of the inspection. This subsection does not prohibit a State from making random inspections of commercial motor vehicles."). The Ninth Circuit, however, expressly declined to reach this issue, noting that there is "precious little California authority on the subject" and that the Attorney General of California has submitted an amicus brief in this action in which he disputes ATA's arguments. 559 F.3d at n.13.  In accordance with the Ninth Circuit, the Court finds it unnecessary to determine whether ATA will prevail on this argument.

framework such that the minimum standards for truck safety are met during such times as the trucks are providing drayage services at the ports."[13]  Los Angeles Opp'n at 9.

The Court finds that to the extent that these provisions require motor carriers to maintain and present records regarding "driver qualifications, driver training, vehicle maintenance, safety inspection, controlled substances and alcohol testing and hours-of-service for all employee drivers and contractor drivers," these provisions likely fall within the safety exception, because they provide a mechanism by which the Ports can ensure that only qualified drivers and safe vehicles are operating drayage trucks at the Ports.  See, e.g., Ace Auto Body & Towing, Ltd. v. City of New York, 171 F.3d 765 (2d Cir. 1999) (towing ordinance requiring, *inter alia*, reporting and record keeping fell within the safety exception).  However, to the extent that these provisions require the keeping and reporting of other records, the Court finds that it is not likely that they are sufficiently related to safety so as to save them from preemption under the FAAA Act.

### 7.    POLA Requirement (i); POLB Requirement (j): Driver Credential

Los Angeles Requirement (i) and Long Beach Requirement (j) requires that concessionaires ensure and keep records of driver enrollment in the Transportation Worker Identification Credential (TWIC) program.

ATA argues that this requirement is duplicative of the Federal TWIC requirement, which can be otherwise enforced through Port tariffs. However, as the Court has stated, it does not find this to be a basis for holding that a provision is outside the scope of the safety exception.

The Los Angeles defendants argue that because ATA is not challenging

---

[13] The Long Beach defendants further argue that this provision does not relate to "price, route or service," because it amounts to a duplication of existing safety laws and regulations.  Long Beach Opp'n at 16.  For the reasons stated above, the Court concludes that the provisions at issue are related to a "price, route, or service" of motor carriers.

implementation of the TWIC as preempted, the Ports need not show how this provision relates to safety in order to survive injunction.  Los Angeles Defendants at 9.  However, defendants also argue that "a method of screening drivers and ensuring that each driver has been screened (as opposed to using someone else's TWIC identification) is essential if the Ports are to protect their property from security threats ranging from terrorist threats to drug trafficking."[14]  Los Angeles Opp'n at 10.

The Court finds that these provisions likely fall within the safety exception, because preventing individuals without proper credentials from accessing the Ports will help to protect the safety of both drayage truck drivers and other individuals at the Ports.  Therefore, they are unlikely to be preempted.

## 8.    POLA Requirement (j), (m); POLB Requirement (k),(n): Compliance Tags and Technology

Los Angeles Requirement (j) and Long Beach Requirement (k) require that when entering and leaving Port property and while on Port property, concessionaire shall ensure that each truck is equipped with a means of Clean Trucks Program Compliance Verification.  Los Angeles Requirement (m) and Long Breach Requirement (n) require that while entering and leaving Port Property, concessionaire shall implement technology required by the Concession or the Clean Trucks Program.

ATA makes no argument about these provisions in its motion.  The Los Angeles defendants argue that without the "instant access to the DTR information, the Ports would be powerless to gain control over access to their property. . . If the DTR information is inaccurate because, for example, drivers are using the same RFID in multiple trucks, the Port loses control over access to its property."  Los Angeles Mot. at 10.

---

[14] The Long Beach defendants again argue that this provision is not an unlawful regulation of "price, route, or service" because it mirrors the requirements of Federal law. Long Beach Opp'n at 16. For the reasons stated above, the Court concludes that the provisions at issue are related to a "price, route, or service" of motor carriers.

Again, because the Ports' ability to limit access to only those drivers and trucks that comply with non-preempted safety-related regulations is directly related to the safety of individuals operating drayage trucks and other individuals at the Ports, the Court finds that these provisions are likely to fall within the safety exception.

### 9.   POLA Requirement (k); POLB Requirement (l): Security

Los Angeles Requirement (k) and Long Beach Requirement (l) require concessionaires to ensure that trucks comply with all security laws and regulations.

ATA argues that these provisions are duplicative of the federal, state, and municipal laws and regulations with which they require compliance, and that this provision could enforced by suspending or revoking motor carriers' interstate operating authority at the ports.  Reply at 21.  However, as the Court has stated, it does not find this to be a basis to find that a provision is outside the scope of the safety exception.

The Los Angeles defendants argue that this requirement ensures compliance with the existing legal framework to ensure that port security laws are met by the trucks providing drayage to the ports, and therefore it's primary focus is safety.[15]  The Court agrees that the primary focus of this provision appears to be safety.  As the Court has stated herein, such provisions prevent individuals who pose a safety risk from accessing the Ports, which protects the safety of both drayage truck drivers and other individuals at the Ports.  Therefore, these provisions are unlikely to be preempted.

### 10.   POLA Requirement (l); POLB Requirement (m): Placards

Los Angeles Requirement (l) and Long Beach Requirement (m) mandate that concessionaires "[w]hen entering and leaving Port Property and while on Port Property" post placards on all trucks referring the public to a phone number for the Concession Administrator to report concerns regarding truck emissions, safety, and compliance.

---

[15] The Long Beach defendants again argue that this provision has no impact on "price, route, or service" of a motor carrier because it mirrors existing laws.  Long Beach Opp'n at 17. For the reasons stated above, the Court concludes that the provisions at issue are related to a "price, route, or service" of motor carriers.

ATA argues that the off-port display of placards is preempted by 49 U.S.C. § 14506(a), which has no safety exception.  49 U.S.C. § 14506(a) provides that "[n]o . . . political subdivision of a State . . . may enact or enforce any law, rule, regulation standard, or other provision having the force and effect of law that requires a motor carrier . . . to display any form of identification on or in a commercial motor vehicle . . . . other than forms of identification required by the Secretary of Transportation. . . ."

The Los Angeles defendants, however, argue that in fact, there is no off-port display requirement in the Concession agreement.  Los Angeles Opp'n at 11.  Furthermore, defendants argue that the on-port display requirement is safety-related, because "the enlistment of the public in such a manner is directly related to ensuring the safe operation of motor vehicles and the security of Port property."  Los Angeles Opp'n at 11; see also Long Beach Opp'n at 17.  ATA, however, counters that there is no purpose to requiring trucks to carry a placard while on port property, given that they are being tracked according to RFID tag, DTR entries, and TWIC data, and given that members of the public – the alleged targets of the placard information – are not permitted on Port property.  Reply at 22.

The Court finds ATA's arguments unconvincing.  The primary motivation behind the placards does appear to be motor vehicle safety, in that it provides a mechanism for individuals – including other operators of trucks accessing the Ports – to report unsafe driving or other dangerous activity to the proper authorities.  Therefore, the provisions are unlikely to be preempted.

### 11.     Schedule 2, Section 2.1: Concession Fees

Schedule 2, Section 2.1 of both the Los Angeles and Long Beach Concession agreements requires concessionaires to pay an application fee and an annual fee per truck.

ATA argues that "[b]ecause use of the Concession agreement mechanism is preempted, collection of Concession fees is preempted."  Mot. at 9.  The Long Beach defendants, however, argue that the fees required by both the Los Angeles and Long

Beach Concession agreements cover costs of implementing non-preempted Concession agreement provisions. Long Beach Defs' Opp'n at 22. This justification, however, is too tenuous for the Court to conclude that this provision is likely to fall within the safety exception, and therefore the application fee and annual fee per truck are likely to be preempted.[16]

---

[16] At the hearing, defendants argued that the Concession fees should not be preempted, because they are permissible under the line of cases beginning with Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc., 405 U.S. 707, 716 (1972). In Evansville, the Court held that the Commerce Clause does not prohibit states or municipalities from charging commercial airlines a head tax on passengers, as long as the "toll is based on some fair approximation of use or privilege of use." Id. In Northwest Airlines v. County of Kent, 510 U.S. 355, 367 (1994), the Court held that "a levy is reasonable under Evansville if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce. . ."; applying this test, the Court found the airport fees at issue to be reasonable. Id. In American Trucking Ass'ns v. Scheiner, 483 U.S. 266, 290, by contrast, the Court struck down a state flat tax on operation of trucks on highways, where it discriminated against out of state vehicles, and where the tax did "not even purport to approximate fairly the cost or value of the use of Pennsylvania's roads." In this case, there is insufficient evidence before the Court at this juncture to determine whether the Concession fees approximate the cost or value of use of the Ports and are reasonable under the Evansville test. See 405 U.S. at 716.

Defendants also noted at the hearing that in some cases in which towing ordinances have been upheld under the safety exception, an application fee provision was included in the upheld ordinance. See, e.g., Galactic Towing, Inc. v. City of Miami Beach, 341 F.3d 1249 (11th Cir. 2003) (upholding regulation under the safety exception that required, inter alia, an initial application fee and a renewal application fee). However, based on the record before the Court, the Court cannot determine that the fees in this case are sufficiently related to the non-preempted safety-related provisions of the Concession agreements. Of specific concern to the Court is the fact that the Los Angeles fee is significantly higher than the Long Beach fee, despite the fact that the non-preempted safety provisions of the two Concession agreements are substantially similar. Specifically, under the Los Angeles Concession agreement, concessionaires are required to pay a $2500 application fee and an annual fee of $100 per permitted truck, while under the Long Beach Concession agreement, concessionaires are required to pay only a $250 application fee and

(continued...)

## 12.   Schedule 2, Section 2.2 (Reporting Requirements) and 2.3 (Periodic Reviews/Audits)

Schedule 2, Section 2.2, requires concessionaires to update and maintain accurate data in the DTR, Concession Registry, and Driver Registry, and to notify the port of changes to DTR information, concessionaire information, driver lists and status, and "other information as may reasonably be required by the Executive Directors and Concession Administrator."  Schedule 2, Section 2.3 requires that the concessionaire agree to allow the Ports to inspect the concessionaire's property and records regarding the concessionaire's compliance with the Concession agreement "while the Concession is in effect and for one year thereafter."

ATA argues that these provisions relate to collection of information and requirements that are themselves preempted.  Furthermore, ATA argues that the provision requiring reporting of "other information as may reasonably be required by the Executive Directors and Concession Administrator" is preempted because it is not limited to matters "genuinely responsive to safety."  Mot. at 10.  Furthermore, ATA argues that with regard to the provision requiring inspection of concessionaire property, including equipment to perform Drayage Services, "[t]here can be no safety-based reason to require inspection of a motor carrier's entire fleet off Port property (particularly inasmuch as the Ports could perform safety-related inspections of any trucks entering Port property.)"  Mot. at 10.  ATA further argues that there is no justification for allowing such inspections one year after the Concession agreement has expired.[17]  Mot. at 10.

---

[16](...continued)
an annual fee of $100 per permitted truck.  Therefore, the Court cannot determine here that the Concession fee provision is "genuinely responsive to safety."

[17] ATA also argues that under 49 U.S.C. § 31142(d), states [including political subdivisions] are required to "recognize[] as adequate" inspections of commercial motor

(continued...)

34

The Long Beach defendants respond that recordkeeping enhances motor vehicle safety because it creates a paper-trail that can aid in tracking compliance with Federal and State safety regulations.[18]  Long Beach Opp'n at 18.

The Court finds that to the extent that this provision allows for inspection of records related to the non-preempted safety provisions of the Concession agreements, while the Concession agreement is in effect, this provision appears to be genuinely responsive to motor vehicle safety.  Specifically, it provides a mechanism whereby defendants may track compliance with safety regulations, and ensure that motor carriers are not circumventing these requirements.   However, to the extent that it requires the reporting and auditing of additional information, it is preempted.  In particular, the requirements that motor carriers notify the Ports regarding "other information as may reasonably be required by the Executive Directors and Concession Administrator" is preempted as too vague to comport with the safety requirement.  In addition, the requirement that motor carriers retain records for inspection after the Concession agreement is no longer in effect appears to be too broad to fit within the confines of the safety exception, because ensuring compliance with safety regulations would not appear to promote motor vehicle safety once the trucks are no longer operating at the Ports.

---

[17](...continued)
carrier vehicles performed under federal standards or by states with approved inspection plans.

[18] The Long Beach defendants again argue that these provisions are not related to the "price, route, or service" of motor carriers, because these provisions do not impose burdens not already imposed by federal law.  Long Beach Opp'n at 18, citing 49 C.F.R. § 382.401, 382.403 (reporting and retention of records related to alcohol and drug testing); 49 C.F.R. § 390.29 and 390.31 (general rules on furnishing and keeping records); 49 C.F.R. § 391.51 and 391.53 (rules regarding maintenance driver qualification records); 49 C.F.R. § 395.8(k) (hours of service records); 49 C.F.R. §396.3(b),(c) (requirements regarding inspection, repair, and maintenance records); 49 C.F.R. § 379, Ap. A (retention of financial, corporate, and transactional records).  For the reasons stated above, the Court concludes that the provisions at issue are related to a "price, route, or service" of motor carriers.

**13.   Schedule 3: Indemnity and Insurance Requirements**

Schedule 3 requires the concessionaire to "indemnify, protect, defend, and hold harmless" the Port, and requires the concessionaire to procure and maintain general liability insurance, automobile liability insurance, and workers compensation insurance. It further requires concessionaires to report in writing to the Executive Director any accident or occurrence involving death or injury to any person or damage in excess of $500 occurring on Port property or the Harbor district.

ATA argues that nothing in these provisions is generally responsive to motor vehicle safety.[19] Mot. at 11. The Court agrees that the requirements that the Ports "indemnify, protect, defend, and hold harmless" the Ports, and the requirement that concessionaires report in writing accidents to the Ports do not fall within the safety exception.

However, the Court notes that under the statutory safety exception, the FAAA Act does not "restrict . . . the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization." See also Hott v. City of San Jose, 92 F. Supp. 2d 996 (N.D. Cal. 2000) (holding that municipal regulations requiring liability insurance for tow truck companies were not preempted under the safety exception). This provision applies even if the insurance requirement is not for safety purposes. See Cal. Dump Truck Owners Ass'n v. Davis, 302 F. Supp. 2d 1139, 1143 (E.D. Cal. 2002) (holding in Ours Garage, 536 U.S. 424 "necessarily implies that a regulation that is not an exercise of 'safety regulatory authority' can nonetheless escape preemption by meeting the requirements in [the 'relating to insurance' clause]"). Therefore, the provisions in

---

[19] The Long Beach defendants again argue that this provision does not require additional insurance coverage, but rather requires that the concessionaire comply with relevant Federal and state law, and therefore does not affect the "price, route, or service" of motor carriers. Long Beach Opp'n at 19. For the reasons stated above, the Court concludes that the provisions at issue are related to a "price, route, or service" of motor carriers.

1    Schedule 3 regarding insurance requirements are unlikely to be preempted.[20]

2    **E.      Severability of Non-Safety Related Provisions Preclude Concession**

3    **Agreements**

4    ATA argues that "once all preempted provisions are excised from the Concession

5    plans, any remaining construct is very different from the scheme contemplated by the

6    Ports.  Thus, this Court should avoid the 'task of unscrambling the egg' and find the

7    Concession agreements preempted as a whole."  Mot. at 17, citing United States v.

8    Manning, 527 F.3d 828, 840 (9th Cir. 2008) (where certain provisions of a statute were

9    preempted, whole statute was preempted, because "excising the most significant

10   _____

11   [20]ATA also argues that Schedule 4, a procedural mechanism which calls for
12   termination of the Concession agreement upon  "events of default" by the concessionaire,
     is preempted.  The Court finds that, in general, to the extent this provision requires
13   compliance with non-preempted portions of the Concession agreements, or with
14   regulations related to motor vehicle safety, it is not preempted.  However, to the extent that
     this provision requires termination of the Concession agreements based on violations of
15   preempted provisions, or violations of other non-safety related requirements, it is
16   preempted.

17        Specifically, with regard to (4.2) Events of Default, section (d) (repeated violations
18   of traffic rules and regulations) and section (e) (any violation of the Patriot Act of 2001 or
     Department of Homeland Security regulations, including any facility security plan) appear
19   to be genuinely responsive to safety concerns, and therefore likely fall within the safety
20   exception.  Section (b) (any failure to comply with the terms and conditions of the
     Concession) is not preempted, to the extent it requires compliance with non-preempted and
21   severable provisions of the Concession.  Section (k) (violation of a Port Tariff, a city
22   Ordinance, a State law, or a Federal law) is likewise not preempted to the extent that it
     requires compliance with provisions and laws specifically addressed to motor vehicle
23   safety.  Section (f) (any fraud or misrepresentation in the Concession application,
24   information or data submitted to the Port required under the Concession) is not preempted
     to the extent the required information is related to the motor vehicle safety provisions of
25   the Concession agreements.

26        The remaining "events of default" appear to be outside the scope of the safety
27   exception, and therefore are likely to be preempted.

28

conflicts in the statute would result in a very different statute than the one envisioned"
and because excising "would require us to examine and rewrite most of the statute in a
vacuum as to how the various provisions were intended to intersect and in a way that
would be at odds with the purpose of the statute").

The Los Angeles defendants respond that the Ninth Circuit stated that it was "not
prepared to hold that every provision must be preempted" and that it would "not direct
that the Concession agreements be enjoined in their entirety . . ." Am. Trucking, 559
F.3d at 1060 (noting that "the agreements contain severance provisions and, in general,
those kinds of provisions are respected."); see also Santa Barbara Sch. Dist. v. Superior
Court, 13 Cal. 3d 315, 330-31 (1975) (en banc) (severance is "possible and proper
where the language of the statute is mechanically severable, that is, where the valid and
invalid parts can be separated by paragraph, sentence, clause, phrase, or even single
words. . . [a]lthough not conclusive, a severability clause normally calls for sustaining
the valid part of the enactment. . ." ).  The Los Angeles defendants note that the
Concession agreements contain separate and distinct paragraphs on distinct topics.  Los
Angeles Opp'n at 14.  Furthermore, the Los Angeles defendants argue that there is no
evidence in the record that the provisions identified as likely to be preempted by the
Ninth Circuit were of "critical importance" such that the Concession agreements could
not be enacted without them.  Los Angeles Opp'n at 16.

The Ninth Circuit directed this Court to determine on remand "whether a
preliminary injunction should run against all or only a portion of each Concession
agreement." Am. Trucking, 559 F.3d at 1060.  The Ninth Circuit noted that in United
States v. Manning, 527 F.3d 828, 840 (9th Cir. 2008), a statute with a savings clause
was nevertheless preempted in whole, because the "most significant" part of the statute
was preempted, and excising those provisions would result in a very different statute.
Id  The Ninth Circuit noted that, by contrast, in Nat'l Adver. Co. v. City of Orange, 861
F.2d 246, 250 (9th Cir. 1988), the court determined that a partial invalidation of an
ordinance was appropriate based on the intent of the City and the fact that the remainder

of the ordinance could still "function effectively." <u>Id</u>. In this case, it appears that enjoining the preempted provisions of the Concession agreements, which in large part address the types of businesses and trucks that may operate at the Ports, will not prevent the remaining provisions from "function[ing] effectively." <u>See id</u>. The non-preempted provisions serve a different purpose – promoting motor vehicle safety – than the preempted provisions, and there does not appear to be any reason that the provisions promoting safety cannot stand independently. Furthermore, the statute in <u>Manning</u>, 527 F.3d at 840, is distinguishable, because excising the preempted portions of the statute would have required the court "to examine and rewrite most of the statute." In this case, because the provisions are distinctly separated by topic, excising the preempted provisions is considerably more practicable. Therefore, to the extent the Ninth Circuit directed the Court to determine if the remaining provisions may stand, the Court finds that they can.

Furthermore, the Court finds that, under the standard articulated in <u>Winter</u>, an injunction against those provisions that fall within the statutory safety exception is not appropriate because ATA has failed to establish a "likelihood of success on the merits" with regard to those provisions. <u>See</u> 129 S. Ct. at 374-75 ("[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.")

**IV.   CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part ATA's motion on remand for entry of preliminary injunction. Specifically, the Court GRANTS ATA's motion with regard to:

(1) POLA Concession Requirement (d): Driver Hiring (Independent Operator Phase Out);

(2) POLA Requirement (d); POLB Requirement (e): Driver Hiring (Hiring Preferences);

(3) POLA Requirement (n); POLB Requirement (o): Financial Capability;

(4) POLB Requirement (i): Driver Health Insurance;

(5) POLA Requirement (f) and POLB Requirement (f): Compliance with Truck Routes and Parking Restrictions;

(6) POLA Requirement (e); POLB Requirement (a): Clean Truck Tariff;

(7) Schedule 2, Section 2.1: Concession Fees[21]

The Court DENIES ATA's motion with regard to:

(1) POLA Requirement (a); POLB Requirement (b): Licensed Motor Carrier;

(2) POLA Requirement (b); POLB Requirement (c): Permitted Trucks;

(3) POLA Requirement (c); POLB Requirement (d): Driver Compliance;

(4) POLA Requirement (g); and POLB (g): Truck Maintenance;

(5) POLA Requirement (i); POLB Requirement (j): Driver Credential;

(6) POLA Requirement (j), (m); POLB Requirement (k),(n): Compliance Tags and Technology;

(7) POLA Requirement (k); POLB Requirement (l): Security;

(8) POLA Requirement (l); POLB Requirement (m): Placards;

With regard to POLA Requirement (h) and POLB Requirement (h): Compliance with Truck Safety and Operations Regulations: The Court DENIES ATA's motion to the extent that these provisions require motor carriers to maintain and present records regarding "driver qualifications, driver training, vehicle maintenance, safety inspection, controlled substances and alcohol testing and hours-of-service for all employee drivers and contractor drivers," but GRANTS ATA's motion to the extent that these provisions require the keeping and reporting of other records.

---

[21] At the hearing, defendants inquired as to whether the Ports could implement otherwise preempted provisions of the Concession agreements, if motor carriers voluntarily chose to enter such an agreement in exchange for payment. The Court finds that this issue is outside of the scope of the matters before the Court, and therefore the Court declines to so find.

With regard to Schedule 2, Section 2.2 (Reporting Requirements) and 2.3 (Periodic Reviews/Audits), the Court DENIES ATA's motion to the extent that this provision requires reporting of information related to motor carriers' compliance with non-preempted safety-related provisions of the Concession agreements while the Concession agreement is in effect.  The Court otherwise GRANTS ATA's motion with regard to this provision.

With regard to Schedule 3: Indemnity and Insurance Requirements**:** The Court GRANTS ATA's motion with respect to all provisions except those regarding insurance (i.e. provisions 3.2-3.8).  The Court DENIES ATA's motion with regard to provisions 3.2-3.8.

With regard to Schedule 4, the Court GRANTS in part and DENIES in part ATA's motion, in the manner set forth in footnote 20 herein.

It is ORDERED that a preliminary injunction issue pending the trial herein, or until further order of Court, granting the following relief:

1. The Los Angeles defendants shall refrain and be enjoined from implementing and enforcing Concession Requirements (d); (n); (f); (e); Schedule 2, Section 2.1; and Schedule 3, Sections 3.1 and 3.9.

2. The Long Beach defendants shall refrain and be enjoined from implementing and enforcing Concession Requirements (e); (o); (i); (f); (a); Schedule 2, Section 2.1; and Schedule 3, Sections 3.1 and 3.9.

3. The Los Angeles and Long Beach defendants shall refrain and be enjoined from implementing and enforcing Concession requirement (h) to the extent it requires motor carriers to maintain and present records on matters other than "driver qualifications, driver training, vehicle maintenance, safety inspection, controlled substances and alcohol testing and hours-of-service for all employee drivers and contractor drivers."

4. The Los Angeles and Long Beach defendants shall refrain and be enjoined from implementing and enforcing Schedule 2, Sections 2.2 and 2.3, except to the extent

that these provisions require reporting of information related to motor carriers' compliance with non-preempted safety-related provisions of the Concession agreements while the Concession agreement is in effect.

5. The Los Angeles and Long Beach defendants shall refrain and be enjoined from implementing and enforcing Schedule 4.2 (a), (c), (g), (h), (i), and (j).  The Court also enjoins the Los Angeles and Long Beach defendants from implementing Schedule 4.2 (b) (except to the extent it requires compliance with non-preempted and severable provisions of the Concession agreements), (k) (except to the extent it requires compliance with provisions and laws specifically addressed to motor vehicle safety), and (f) (except to the extent the information it requires is related to motor vehicle safety provisions of the Concession agreements).


IT IS SO ORDERED


Dated: April 28, 2009

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE