1

2

3

4                                                        JS - 6

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                          WESTERN DIVISION

11   AMERICAN TRUCKING              )        Case No. CV 08-4920 CAS (RZx)
     ASSOCIATIONS, INC.,            )
12                                  )
                       Plaintiff,   )        **FINDINGS OF FACT AND**
13                                  )        **CONCLUSIONS OF LAW**
     vs.                            )
14                                  )
                                    )
15   THE CITY OF LOS ANGELES; ET AL. )
                                    )
16                     Defendants.  )
                                    )
17                                  )
                                    )
18   _____

19

20        This case was tried to the Court on April 20, 21, 22, 23, 27, 28, and 29, 2010.  The

21   parties filed their post-trial briefs on May 14, 2010.  Robert Digges, Jr. of the ATA

22   Litigation Center, and Christopher McNatt, Jr. of Scopelitis, Garvin, Light, Hanson &

23   Feary, LLP, appeared on behalf of plaintiff American Trucking Associations, Inc.

24   ("ATA").  Steven Rosenthal, Alan Palmer, and Susanna Chu of Kaye Scholer LLP, and

25   Thomas Russell and Simon Kann of the Los Angeles City Attorney's Office, appeared as

26   counsel on behalf of defendants City of Los Angeles, the Harbor Department of the City

27   of Los Angeles, and the Board of Harbor Commissioners of the City of Los Angeles.

28   David Pettit and Melissa Perrella of the Natural Resources Defense Council ("NRDC"),

     appeared as counsel on behalf of intervenor defendants NRDC, Sierra Club, and

Coalition for Clean Air, Inc.

## I.    INTRODUCTION

On March 20, 2008, defendant Los Angeles Harbor Board of Commissioners adopted an order which provides that "beginning October 1, 2008, at 8:00 am, no Terminal Operator shall permit access into any Terminal in the Port of Los Angeles to any Drayage Truck unless such Drayage Truck is registered under a Concession from the Port of Los Angeles . . ."  The Los Angeles Concession Agreement requires that motor carriers accessing the Port of Los Angeles ("POLA" or "the Port") comply with a number of requirements in order to maintain this access.[1]

On July 28, 2008, ATA filed the complaint in this action against defendants City of Los Angeles, Harbor Department of the City of Los Angeles, and Board of Harbor Commissioners of the City of Los Angeles (collectively "POLA"), and City of Long Beach, Harbor Department of the City of Long Beach, and Board of Harbor Commissioners of the City of Long Beach.[2]  The first and second claims allege that the Los Angeles Concession Agreement is preempted by the Supremacy Clause of the United States Constitution and the motor carrier provision of the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501(c) ("the FAAA Act"). The third claim alleges that the Concession Agreement is preempted because it places an undue burden on and discriminates against the right of motor carriers to engage in interstate commerce.

---

[1] On February 19, 2008, defendant Long Beach Harbor Board similarly mandated that drayage trucks would be required to hold a Concession Agreement with the City of Long Beach in order to enter the Port of Long Beach (together with the Port of Los Angeles, "the Ports") beginning on October 1, 2008.

[2] On October 20, 2009, the Court dismissed the Long Beach defendants with prejudice pursuant to the parties' stipulation of settlement.  That settlement agreement is now the subject of a collateral attack by the intervenors herein.  See Natural Resources Defense Council, Inc. v. City of Long Beach, No. CV10-826 CAS (PWJx).

On July 30, 2008, ATA moved for a preliminary injunction pursuant to the first and second claims for relief restraining implementation of the Ports' mandatory Concession Agreements.  On September 9, 2008, this Court denied ATA's motion for a preliminary injunction.  See Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 577 F. Supp. 2d 1110 (C.D. Cal. 2008).  The Court found that ATA would likely demonstrate that the Concession Agreements "related to a price, route, or service" of motor carriers, which would generally render them preempted under the FAAA Act.  Id. at 1118; see 49 U.S.C. § 14501(c)(1).  The Court further determined that ATA would have a significant likelihood of success in showing that "the fact that the Ports sit on sovereign tidelands does not exempt [the Concession Agreements] from preemption under the FAAA," and that "the market participant exception to preemption does not apply in this case."  Id. at 1118-1123; see Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist., 498 F.3d 1031, 1040 (9th Cir. 2007) (holding that in cases of statutory preemption, "the market participant doctrine is based on the proposition that pre-emption doctrines apply only to state *regulation*.") (emphasis added).  However, the Court held that ATA was nevertheless unlikely to succeed on the merits, because the Concession Agreements likely fell under the FAAA Act's statutory "safety exception."  Id. at 1125; see 49 U.S.C. § 14501(c)(2)(A) (preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles . . .").  Moreover, the Court concluded that the Supreme Court's holding in Castle v. Hayes Freight Lines, Inc., 349 U.S. 61 (1954), did not preclude application of the "safety exception" to the Concession Agreements.  Id. at 1125 (citing 349 U.S. at 63-64 (holding that under the Federal Motor Carrier Act, a state could not punish a motor carrier for repeated violations of safety standards by suspending the motor carrier's right to engage in interstate commerce over the state's roads)).  The Court also found that ATA had not shown a likelihood of irreparable harm, and that the balance of the hardships and the public interest weighed in favor of denying the injunction.  Id. at 1126-1128.  On March 20, 2009, in Am. Trucking Ass'ns Inc. v. City of Los Angeles, 559 F.3d 1046 (9th Cir. 2009) (hereinafter "Am.

Trucking I") the United States Court of Appeals for the Ninth Circuit reversed the Court's September 9, 2008 order, finding instead that the "safety exception" to the FAAA Act likely did not apply to at least some of the provisions of the Concession Agreements.  559 F.3d at 1055-1057.  The Ninth Circuit remanded the case to this Court for further proceedings.  Id.

Following the decision in Am. Trucking I, in April 3, 2009, ATA filed a motion for entry of preliminary injunction on counts I and II of the complaint.  On April 28, 2009, this Court issued an order granting in part and denying in part ATA's motion, which enjoined POLA from implementing and enforcing various provisions of the Concession Agreement.[3]  Am. Trucking Ass'ns, Inc. v. City of Los Angeles, No. 08-4920 CAS (CTx), 2009 WL 1160212, at * 7 (C.D. Cal. Apr. 28, 2009).  This Court again found that the holding in Castle, 349 U.S. at 61, was inapplicable to the instant case.[4]  Id. On February 24, 2010, the United States Court of Appeals for the Ninth Circuit affirmed the Court's April 28, 2009 order with one limited exception, in Am. Trucking Ass'ns Inc. v. City of Los Angeles, 596 F.3d 602 (9th Cir. 2010) (hereinafter "Am. Trucking II").  Specifically, the Ninth Circuit affirmed this Court's holding that certain provisions of the Port's Concession Agreement are preempted by the FAAA Act, and that the preempted provisions of the Concession Agreement are severable.  Id. at 605-07.  The Ninth Circuit in Am. Trucking II vacated this Court's finding that the requirement that drayage trucks display identifying placards with a telephone number fell within the motor vehicle safety exception to the FAAA Act, and remanded in order for this Court to consider whether 49 U.S.C. § 14506(a) preempts the requirement.  Id. at 606.  On

---

[3] Specifically, the Court enjoined POLA from enforcing several provisions currently at issue in the instant action, see infra section II, including the employee driver provision, the off-street parking provision, and the financial capability provision.

[4] Upon review, the Ninth Circuit held that "[f]or purposes of a preliminary injunction, we conclude that Castle does not establish the likelihood of ATA succeeding on the merits on this issue.  However, this issue is not finally resolved and may be reconsidered in further proceedings for a permanent injunction."  596 F.3d at 607.

February 25, 2010, this Court denied both ATA's and POLA's cross-motions for summary judgment.

Because the parties have now provided the Court with a complete evidentiary record, the Court will revisit each of the issues upon which it previously ruled.

## II.   THE CONCESSION AGREEMENT PROVISIONS AT ISSUE

In the instant proceeding, ATA challenges five provisions of the Los Angeles Concession Agreement.  Apr. 20 Tr. at 16:15-21 (ATA Opening).  Motor carriers must comply with these requirements, among others, in order to maintain access to the Port. The five challenged provisions are as follows:

1.   The Employee Driver Provision.  This provision provides in relevant part: Driver Hiring. . . . Concessionaire shall be granted a transition period, as set forth in the schedule below, by which to transition its Concession drivers to 100% Employee Concession drivers by no later than December 31, 2013 ("Transition Period"). . . .
Ex. 181 ¶ III(d), "POLA Concession Agreement."

2.   The Off-Street Parking Provision.  This provision provides in relevant part: Compliance with Truck Routes and Parking Restrictions. Concessionaire shall submit for approval by the Concession Administrator, an off-street parking plan that includes off-street parking location(s) for all Permitted Trucks.  Concessionaire shall ensure that all Permitted Trucks are in compliance with on-street parking restrictions by local municipalities.  Permitted Trucks not in service shall be staged off public streets and away from residential districts. . . .
Ex. 181 ¶ III(f), "POLA Concession Agreement."

3.   The Maintenance Provision.  This provision provides: Truck Maintenance.  Concessionaire shall prepare an appropriate

maintenance plan for all Permitted Trucks.  Concessionaire shall be responsible for vehicle condition and safety and shall ensure that the maintenance of all Permitted Trucks, including retrofit equipment, is conducted in accordance with manufacturer specifications. Maintenance records for all Permitted Trucks shall be available for inspection by the Concession Administrator during business hours. Ex. 181 ¶ III(g), "POLA Concession Agreement."

4.    The Placard Provision.  This provision provides:

Placards.  When entering and leaving Port Property and while on Port Property, Concessionaire shall post placards on all Permitted Trucks referring members of the public to a phone number to report concerns regarding emissions, safety and security compliance to the Concession Administrator and/or authorities.

Ex. 181 ¶ III(l), "POLA Concession Agreement."

5.    The Financial Capability Provision.  This provision provides:

Financial Capability.  Concessionaire shall demonstrate to the satisfaction of the Executive Director that it possesses the financial capability to perform its obligations under this Concession over the term of the Agreement.

Ex. 181 ¶ III(n), "POLA Concession Agreement."

## III.   FINDINGS OF FACT

### A.    The Parties

1.    The City of Los Angeles (the "City") is a municipal corporation established under Article XI of the Constitution of the State of California and is a political subdivision of that state.  Defendant Harbor Department of the City of Los Angeles is a department of the City of Los Angeles.  Defendant Board of Harbor Commissioners ("Board" or "BHC") controls the assets and facilities of the Harbor Department.  Pretrial

Conf. Order ¶ 5.

2.     Plaintiff ATA is the non-profit national trade association for the trucking industry established under the laws of the Commonwealth of Virginia as a federation of affiliated state trucking associations, conferences, and organizations representing every type and class of motor carrier in the country.  The Intermodal Motor Carriers Conference ("IMCC") is an affiliated conference of ATA and is open to all ATA member companies engaged in the intermodal transportation of property.  The IMCC provides services to the intermodal (land-sea) motor carrier members of ATA and represents the interests of these members in a broad range of federal, state, local, and industry policy forums.  Pretrial Conf. Order ¶ 5.

3.     ATA and the IMCC's membership include motor carriers that provide drayage services at the Port.  The Executive Committee of ATA and the IMCC Board authorized and directed that a legal challenge to POLA and the Port of Long Beach Concession Agreements be brought on behalf of ATA members.  ATA and the IMCC authorized this litigation to protect an interest germane to the interests of those organizations.  The vindication of its members' rights is central to ATA's mission, as is set forth in the Bylaws of the American Trucking Associations, Art. II.1, which provides, "[t]he membership of ATA shall be composed of companies, including independent owner-operators . . .", and the IMCC Bylaws, Art. III(a), which provides, "[t]o promote and protect the interests of intermodal motor carriers on legislative and regulatory issues at all levels of government," and the ATA Mission Statement, which provides that it is, "to serve and represent the interests of the trucking industry . . . ." Pretrial Conf. Order ¶ 5.

4.     Intervenor NRDC is a not-for-profit membership organization incorporated under the laws of the State of New York.  The NRDC maintains an office in Santa Monica, California.  Intervenor Sierra Club is incorporated in the State of California as a Nonprofit Public Benefit Corporation and maintains an office in Los Angeles, California.  Intervenor Coalition for Clean Air, Inc. is a nonprofit organization based in

California and maintains an office in Los Angeles, California.  Pretrial Conf. Order ¶ 5.

**B.    The Port of Los Angeles**

5.      The Port is formally organized as the Los Angeles Harbor Department. Pursuant to the City Charter, the Port is an independent, self-funding department of the City of Los Angeles.  Pursuant to Article VI of the City Charter, a five-member Board of Harbor Commissioners has the authority to manage Port assets and Port-related activity and to make and enforce all necessary rules and regulations relating to Port operations within the geographic boundaries of the Harbor District.  Pretrial Conf. Order ¶ 5.

6.      The Port is located along 43 miles of the coast of San Pedro Bay, approximately 20 miles south of downtown Los Angeles adjacent to the Port of Long Beach (collectively with POLA, the "Ports").  Several residential areas adjoin the Port, including the neighborhoods of San Pedro and Wilmington.  Over two million people reside in the communities surrounding the Ports.  Pretrial Conf. Order ¶ 5.

7.      The Port is the leading container port in the United States in terms of shipping container volume and cargo volume, and in 2008 handled more than $240 billion in cargo.  Pretrial Conf. Order ¶ 5.

8.      The total value of cargo handled at the Port was $240.4 billion in 2007. POLA's top trading partners in that year in terms of cargo value were:  China ($115.2 billion); Japan ($39.2 billion); Taiwan ($14.6 billion); South Korea ($9.7 billion); and Thailand ($6.9 billion).  Based on its 2007 cargo volume, POLA ranked as the busiest container port in the United States, the thirteenth busiest in the world, and the fifth busiest in the world when combined with the cargo volume of the adjacent the Port of Long Beach.  Pretrial Conf. Order ¶ 5.

9.      In the years 2007-2009, POLA handled more containers than any other port in the United States.  Pretrial Conf. Order ¶ 5.

10.     The cargo handled at the Port is usually transported in shipping containers of a standard size (sometimes referred to as twenty-foot equivalent units or "TEUs"). This form of cargo can be offloaded directly from ships onto railcars or truck

tractor-trailers for transfer inland.  Ex. 187, "POLA Website FAQs."

11.    In addition to containerized cargo, POLA also handles passengers, automobiles, liquids, dry bulk, and breakbulk cargo with facilities specific to each type of cargo.  Ex. 187, "POLA Website FAQs."

12.    As the leading seaport in North America in terms of shipping container volume and cargo value, the Port generates over 900,000 regional jobs and more than $39 billion in annual wages and tax revenues.  Ex. 183, "Husing Report"; Ex. 187, "POLA Website FAQs."

13.    The Port is self-sustaining solely from revenues it receives from property leases and fees for dockage, wharfage, storage, royalties, and other port services.  Thus, the Port operates without taxpayer support and is designated in the City Charter as a "Proprietary Department," controlling its own funds separately from the rest of the City. Ex. 187, "POLA Website FAQs"; Apr. 27 Tr. at 45-46 (Freeman).

14.    The California State Tidelands Act of 1911 and subsequent legislative acts granted the tidelands and waterfront in San Pedro Bay to the Cities of Los Angeles and Long Beach as trustees for the benefit of the people of California.  Ex. 245, "Ordinance No. 179981."  Subsequent litigation between the United States and the State of California in an original proceeding before the U.S. Supreme Court confirmed that California had sovereign title to the tidelands in San Pedro Bay granted to Los Angeles and Long Beach.  United States v. California, 382 U.S. 448-53 (1966).

15.    All or virtually all of the marine terminals at the Port are located on sovereign tidelands, which the City of Los Angeles holds as trustee subject to the tidelands trust.  Ex. 245, "Ordinance No. 179981."

16.    The Port operates as a landlord port in that it develops terminal facilities and then leases those facilities to shipping lines and stevedoring companies, sometimes referred to as marine terminal operators ("MTOs").  Ex. 267, "CAAP Technical Report"; Ex. 356, "Steinke Decl."

17.    The MTOs load and unload ships, moving cargo between the vessel and the

terminal.  They receive and dispatch cargo into and out of their facilities via rail and truck.  This movement of cargo between a marine terminal and a local destination by truck is commonly referred to as "drayage."  Ex. 183, "Husing Report."

18.     Motor carriers draying cargo to and from the Port act under contract to ocean carriers, cargo owners, freight forwarders, and brokers, and other transportation intermediaries and carriers.  Ex. 183, "Husing Report."

19.     Motor carriers dray containers under bills of lading for each container that designate the points of origination and destination, under the direction of the cargo owner or its agent.  Ex. 183, "Husing Report."

20.     In many cases motor carriers dray containers under "store-door" tariffs of ocean carriers in which the ocean carrier is compensated for the transit between a shipper location in the United States and a foreign port.  In some cases, the bill of lading specifies through transportation by rail to or from the Port, and the drayage carrier serves as a contractor to dray the container between a marine terminal at the Port and an "off-dock" railhead outside the Port.  Ex. 183, "Husing Report."

21.     The majority of drayage trips take place within the State of California.  The Port estimates that drayage trucks transport less than 5% of the cargo that they pick up at POLA to points outside of California, and ATA does not appear to dispute this.

22.     A supply of drayage trucks and drivers is integral to cargo movement at the Port.  Ex. 183, "Husing Report."

23.     The Port has a direct financial interest in the unhindered and efficient flow of cargo through its terminals and in increasing container traffic through the Port terminals.  The Port's revenue is directly tied to the volume of containers moved through the terminals.  The greater the volume of containers handled at the Port, the greater are the Ports' revenues.  Apr. 27 Tr. at 45-46 (Freeman); Ex. 191, "BCG Report."

24.     In light of increasing global trade and larger ships, POLA expects cargo volumes at the Port to increase at a pace sufficient to at least double the demand for cargo-handling capacity over the next decade.  Ex. 272, "Sahagun Article"; Ex. 281,

"POLA Stakeholder Presentation"; Ex. 353, "California Air Resources Board Report."

25.     POLA faces competition from other U.S. ports along the Pacific coast, the Atlantic coast, the Gulf of Mexico and foreign ports emerging in Mexico and Canada. POLA also faces additional competition because of the scheduled 2014 completion of the Panama Canal expansion.  Ex. 245, "Ordinance No. 179981."

26.     The Port needs to continually upgrade and renovate existing terminals and facilities to maintain its competitive position with respect to other ports and capture additional business through improved cargo capacity.  Ex. 191, "BCG Report"; Apr. 27 Tr. at 45-46 (Freeman).

27.     POLA also needs to continually improve the efficiency of cargo operations at the Port to maintain its competitive position with respect to other ports and capture additional business.  Id.

28.     POLA markets itself to potential customers, among other things, on the basis of the efficiency of its terminal operations, its experienced labor force, the quality of its infrastructure, and the "clean" nature of the drayage trucks serving the Port.  See Exs. 291-96, "POLA Advertisements."

**C.     Environmental Impacts Associated with Operations at the Port**

29.     The Port is located in California's South Coast Air Basin (the "Basin"), which has been designated by the United States Environmental Protection Agency as a non-attainment area for the National Ambient Air Quality ("NAAQ") standards, for the 8-hour ozone standard, and for the annual fine particulate matter standard.  At least in 2008, the Basin had the worst air quality in the nation for these pollutants.  Ex. 245, "Ordinance No. 179981."

30.     As of 2008, California's South Coast Air Quality Management District ("SCAQMD") calculated that it could not achieve the NAAQ standards for ozone and particulate matter by the dates specified in the federal Clean Air Act without significant reductions of diesel particulate matter ("DPM") and of particulate matter precursor pollutants nitrogen-oxides ("NOx") and sulfur-oxides ("SOx") from Port operations.  Ex.

267, "CAAP Technical Report"; Ex. 337, "SCAQMD 2007 Air Quality Management Plan."

31.     Emissions inventory data for 2002 indicated that activities at the Ports are responsible for 24 percent of the total DPM, 11 percent of NOx, and 45 percent of SOx emitted in the South Coast Air Basin.  By 2020, activities at the Ports were projected to contribute almost a third of the South Coast Air Basin's DPM, a quarter of its NOx, and over three-fifths of its SOx.  Ex. 336, "SCAQMD MATES III Study."

32.     SCAQMD found that, as of 2008, the area around the Port suffered an average cancer risk from air pollution that was more than 60 percent higher than the average in the South Coast Air Basin (1415 in a million for the Port area; 853 in a million for the basin).  Apr. 23 Tr. at 15 (Chang); Ex. 336, "SCAQMD MATES III Study."

33.     Prior to the implementation of the Port's Clean Truck Program, SCAQMD considered dramatic reductions in diesel truck emissions to be critical to the attainment of the federal air quality standards, because drayage trucks are major emitters of NOx and DPM.  Apr. 23 Tr. at 12-20 (Chang); Ex. 336, "SCAQMD MATES III Study."

34.     Prior to the implementation of the Clean Truck Program, trucks used in drayage operations at the Port (the "drayage truck fleet" or "drayage trucks") tended to be older than those used by national long-haul truck fleets.  Drayage trucks typically started out as long-haul trucks that were then sold to smaller, lower-cost carriers who used them to the end of their useful long-haul lives before selling the trucks to drayage carriers for Port use.  Apr. 27 Tr. (Freeman).

35.     Prior to implementation of the Clean Truck Program, drayage trucks accounted for between 10 and 24 percent of the total emissions of DPM and NOx from Port sources.  Ex. 268, "CAAP Overview."

**D.     Environmental and Community Group Opposition to Port Expansion**

36.     As a result of the health risks and environmental impacts caused by Port-related sources, environmental and community groups mobilized to oppose Port

expansion projects.  Such opposition blocked a series of expansion projects at the Port from 2001-2008.  Apr. 27 Tr. (Freeman) at 45-48; see also Ex. 270, "Malnic Article"; Ex. 272-273, "Sahagun Articles."

37.     In May 2001, the Port entered into an agreement with China Shipping Line Company ("China Shipping") by which the Port would construct and China Shipping would lease a new container terminal facility at POLA.  See Ex. 270, "Malnic Article"; Ex. 271, "Schoch Article."

38.     The Natural Resources Defense Council, the Coalition for Clean Air, and certain community groups (collectively, "NRDC") subsequently filed a lawsuit seeking a writ of mandate in the Los Angeles County Superior Court alleging that the Port had failed to comply with the requirements of the California Environmental Quality Act ("CEQA") with respect to the China Shipping terminal.  See Ex. 270, "Malnic Article."

39.     On October 30, 2002, the Second District Court of Appeal found that the Port had not complied with CEQA's requirements before entering into the agreement with China Shipping.  The Second District Court of Appeal also enjoined further construction at the terminal.  NRDC v. City of Los Angeles, 103 Cal. App. 4th 268 (Cal. Dist. Ct. App. 2002).

40.     The Port and NRDC reached a settlement in March 2003, which enabled the Port to proceed with the China Shipping expansion project subject to a number of mitigation measures.  Ex. 271, "Schoch Article"; Ex. 351, "Staff Recommendation, Resolution No. 09-6743."

41.     Under the China Shipping settlement, the Port was required to establish a special fund for mitigation of air quality and aesthetic impacts in the community due to the new terminal.  POLA also committed to extensive equipment modifications in the terminal as well as requiring ships to turn off ship engines and switch to shore-side electrical power when docked, a process called "cold ironing."  The settlement ultimately cost the Port more than $80 million.  Funds for the settlement of the China Shipping litigation came entirely from Port revenue, without contributions from either

the City of Los Angeles or China Shipping.  Ex. 271, "Schoch Article"; Ex. 351, "Staff Recommendation, Resolution No. 09-6743."

42.    Following the China Shipping settlement, POLA resolved to address air quality and environmental issues related to goods movement at the Port and adopted a "green growth" strategy.  Apr. 27 Tr. (Freeman) at 45-48; Ex. 273, "Sahagun Article."

43.    Subsequent to the China Shipping settlement, the Port continued to face pressure from the surrounding community and environmental groups such as NRDC in connection with proposed development projects that could result in higher levels of pollution.  Apr. 27 Tr. (Freeman) at 45-48; Ex. 272-273, "Sahagun Articles."

44.    The Port faced opposition from the NRDC regarding its proposed expansion of the TraPac terminal.  In December 2007, the Board of Harbor Commissioners approved plans to expand the TraPac terminal at the Port to 243 acres from 176, to add on-dock rail facilities, and to reconfigure area roadways to better accommodate additional traffic.  Ex. 273, "Sahagun Article"; Ex. 349, "EIR for China Shipping, TraPac, and Pier 400 Projects."

45.    The Port considered the expansion of the TraPac terminal to be critical because TraPac's customers, Asian shipping lines, had begun using a new generation of larger container ships, which could not be accommodated at TraPac's facilities as configured.  In the summer of 2007, three Asian shipping lines that regularly sent approximately 12,000 cargo containers per month through the TraPac terminal announced plans to take their business to the Port of Long Beach.  This decision represented a significant revenue loss for both TraPac and the Port.  Apr. 27 Tr. (Freeman) at 75-76.

46.    Following the Board of Harbor Comissioners' approval of the plans for the TraPac terminal, NRDC filed an appeal with the Los Angeles City Council seeking to reverse the Board of Harbor Comissioners' decision and indicated it was willing to initiate a lawsuit to prevent the TraPac terminal expansion.  Apr. 27 Tr. (Freeman) at 75-76.

47.     In April 2008, the Port and the coalition averted litigation through an agreement which would permit the TraPac expansion project to go forward.  As part of the agreement, the Port agreed to fund a study of off-Port impacts on health and land use in the communities of San Pedro and Wilmington and also agreed to establish a five-year mitigation fund to offset the environmental impact of the TraPac terminal expansion. Apr. 27 Tr. (Freeman) at 75-76; Ex. 352, "TraPac MOU with POLA."

48.     In August 2009, the Board of Harbor Commissioners approved a 30-year lease with TraPac.  The terminal expansion project will expand and modernize the TraPac terminal, allowing it to more than double its container-handling capacity.  Apr. 27 Tr. (Freeman) at 75-76.

49.     The TraPac expansion is projected to generate hundreds of new terminal jobs, thousands of construction jobs at the peak of construction, and ultimately, as many as 5,400 regional jobs annually associated with terminal operations. Id.; Ex. 273, "Sahagun Article."

**E.     The Port's Clean Air Action Plan and Clean Truck Program**

50.     In response to the air quality and environmental concerns that had halted Port expansion projects between 2001-2008, the respective Board of Harbor Comissioners of POLA and the Port of Long Beach adopted a joint Clean Air Action Plan ("CAAP") in November 2006, and directed their staffs to develop specific measures to reduce emissions related to Port operations, including emissions from heavily polluting trucks.  The Ports announced the CAAP in the San Pedro Bay Ports Clean Air Action Plan Technical Report ("CAAP Report").  Ex. 264, "CAAP Report."

51.     The Ports stated in the CAAP Report that: "The Ports recognize that their ability to accommodate the projected growth in trade will depend upon their ability to address adverse environmental impacts (and, in particular, air quality impacts) that result from such trade.  The [CAAP] is designed to develop mitigation measures and incentive programs necessary to reduce health risks while allowing port development to continue." Ex. 264, "CAAP Report."

52.     The CAAP Report recognized that trucks were a significant source of air pollution and called for the rapid replacement or retrofitting of the entire drayage truck fleet serving the Port -- over 16,000 trucks -- within a five-year period.  As one of a number of potential set of measures towards that goal, the CAAP Report cited the possibility that the Ports would purchase trucks and hire drivers to work at the Ports.  Ex. 264, "CAAP Report."

53.     Following adoption of the CAAP, from November 2006 through February 2008, the two Ports worked together to develop the Clean Truck Program, holding many public meetings, stakeholder meetings, and workshops, including consultant presentations, to gather different ideas for possible implementation.  See Apr. 27 Tr. (Freeman).

54.     As part of the Clean Truck Program development process, the Port retained various consultants.  The Port retained John E. Husing to conduct an economic analysis of the proposed Clean Truck Program.  Mr. Husing prepared a presentation dated September 5, 2007, and a report dated September 7, 2007 ("Husing Report").  The Port also retained the Boston Consulting Group ("BCG") to prepare an analysis of various options for implementation of the Clean Truck Program.  BCG prepared a report that was released in March 2008 ("BCG Report").  Ex. 183, "Husing Report"; Ex. 191, "BCG Report."

55.     The Husing Report concluded that:

At its core, the Clean Truck Program is designed to reduce air emissions in a timely fashion yielding an economic benefit to the community of $4.7 to $5.9 billion due to a reduction in premature deaths, loss of work and fewer medical problems.  Some 95% of this benefit will come from 230-1,450 people not dying.  With the program in place, the ports will be in a position to get their infrastructure plans approved.  This will allow them to expand to their 42.5 million TEU capacity by the period 2020-2030.  The result will be the ability of the ports to support 300,000 to 600,000 new jobs that

would be lost if that infrastructure cannot be built.            Unfortunately, there is a cost of attaining these goals.  That will be the closure of some [licensed motor carriers] and the loss of some of the non-driving jobs and small businesses involved with them, as well as the closing off of port drayage as a route to upward mobility for some workers.  It is the type of choice that has led to the expression, "there is no such thing as a free lunch."

Ex. 183, "Husing Report."

56.    The Husing Report found that in the Port's drayage industry, the "intensive competition, plus lack of [motor carrier] pricing power, has resulted in an industry in which neither the typical LMCs nor the average [independent owner-operators] are particularly profitable."  Ex. 183, "Husing Report," at 24.

57.    Specifically, the Husing Report estimated that the cost to motor carriers of complying with the off-street parking requirement would average $21,237 per truck, and concluded that the cost of using employee drivers would "be 167% higher than the cost of using today's [independent owner-operators]."  In aggregate, the report concluded that drayage services prices would need to increase by 80 percent to cover cost increases, including the cost of higher driver costs, truck purchases, and off-street parking.  Ex. 183, "Husing Report," at 70, 73.

58.    The March 2008 BCG report, which was presented to the Board of Harbor Commissioners, considered various options and determined that the proposed Concession Agreement, including the employee driver requirement, was the most likely to provide sustainable environmental, safety and security, and operational gains.  The BCG Report stated that its Clean Truck Program Option III, which included the requirement for employee drivers, would add a $500 million annual operating cost to the cost of Port drayage, compared to an option without such a requirement.  BCG also set out an Option II, "Enhanced Model with Market Incentives," under which POLA would adopt incentives and funding priorities "that should create market conditions to

encourage the evolution" of the drayage market to meet POLA objectives, but without an employee driver provision.   However, BCG concluded that the benefits from Option II would not be as great as from Option III.  Ex. 191, "BCG Report," at 80.

59.    Port staff subsequently prepared recommendations setting forth the proposed Clean Truck Program for Board review and approval.  Ex. 141, "Staff Recommendation, CAAP."

60.    Port staff's recommendations concerning the Clean Truck Program were adopted by the Board of Harbor Commissioners in public meetings that took place on November 1, 2007, December 20, 2007, March 20, 2008, and May 15, 2008, pursuant to its authority under the City Charter.  POLA also, pursuant to authority granted by the Board of Harbor Commissioners, provided instructions and additional details of the Program to the public to facilitate its implementation.  Ex. 128, "BHC Meeting Minutes, 3/20/08"; Ex. 139, "BHC Meeting Minutes, 5/15/08"; Ex. 238, "BHC Meeting Minutes, 11/1/07"; Ex. 240 "Agenda for BHC Meeting, 12/20/07"; Ex. 243 "BHC Meeting Minutes, 12/20/07."

61.    The first part of the Program, approved in November 2007, took the form of an amendment to Tariff No. 4 ("Tariff").  The Tariff sets forth the basic terms upon which POLA does business as a port.  The amendment adopted a progressive ban on polluting trucks (the "Truck Ban").[5]  Ex. 238 ("BHC Meeting Minutes, 11/1/07"); Ex. 177, "Port of Los Angeles Harbor Tariff No. 4, Section 20"; Ex. 188, "Port of Los Angeles Harbor Tariff No. 4, Sections 2 and 20."

62.    Under the Truck Ban, as of October 1, 2008, all pre-1989 trucks were banned from entering the Port.  The Truck Ban then banned 1989-1993 trucks from

_____

[5] The Harbor Department issues Harbor Tariffs that establish rules, regulations, and fees for the use of POLA.  These regulations are approved by the Board of Harbor Commissioners, and, if not emergency measures, become effective after ratification by Ordinances of the City of Los Angeles.  City of Los Angeles Charter § 653.  The Harbor Tariffs are penally enforceable.  Harbor Tariff No. 4, Section 2, Item 220(b).

entering the Port as of January 1, 2010, in addition to 1994-2003 trucks that had not been retrofitted.  On January 1, 2012, all trucks that do not meet the 2007 Federal Clean Truck Emissions Standards will be banned from the Port.  Id.

63.     At the Board of Harbor Commissioners' December 20, 2007 meeting, the Board established that MTOs must collect a $35.00 fee per loaded, twenty-foot container and $70.00 for each forty-foot or larger container hauled through a terminal gate by an older truck ("Clean Truck Fee") as an additional piece of the Program.  Ex. 243, "BHC Meeting Minutes, 12/20/07."

64.     The second part of the Program, approved by the Board of Harbor Commissioners on March 20, 2008, set forth POLA's intention to require concessions in principle and authorized in principle a series of grants and subsidies to encourage POLA's motor carriers to replace or retrofit older, dirtier trucks to 2007 emissions standards.  The contemplated concession plan included a requirement that motor carriers wishing to provide drayage services at the Port must become concessionaires at the Port and agree to certain terms of performance, including a requirement that drivers be employees.  The requirement created a direct contractual relationship between the Port and the motor carriers performing drayage services for the Port.  Ex. 128, "BHC Meeting Minutes, 3/20/08."

65.     Prior to October 1, 2008 (the effective date of the Concession requirement) it was not necessary to enter into any contracts or leases with POLA to provide drayage of containers.

**F.      Adoption of the Concession Agreement Requirement**

66.     POLA staff's March 12, 2008 and May 6, 2008 recommendations, which the Board of Harbor Commissioners approved, explained the safety and security benefits of the Concession Agreement with the employee driver provision.  Ex. 141, "Staff Recommendations, 5/6/08"; Ex. 224, "Staff Recommendations, 3/12/08."

67.     Based on Port staff's recommendations, the Board determined that requiring drayage trucks serving the Port to be registered under a Concession Agreement would

best serve the Port's proprietary objectives of cleaner air, enhanced safety and security, and a reliable workforce.  Ex. 245, "Ordinance No. 17981."

68.    In Spring 2008, the Board made specific findings regarding the serious safety and security problems associated with drayage trucks at the Port.  The Board also made findings that the Port's air quality and security and safety goals would be best served by requiring that motor carriers performing drayage services at the Port under a Concession Agreement ("concessionaires") use employee drivers.  Ex. 184, "BHC Order No. 6956"; Ex. 245, "Ordinance No. 17981."

69.    The March 30, 2008 Opinion of the President of the Board of Harbor Commissioners, adopted as the opinion of the entire Board, set forth the reasons for the Board's adoption of the Clean Truck Program, including its environmental, security, and reliable workforce goals.  Ex. 128, "BHC Meeting Minutes, 3/20/08."

70.    BHC Order No. 6956 and Los Angeles Ordinance No. 179981 (adopted by the Board of Harbor Commissioners and approved by the Los Angeles City Council), found that, as neighbor to millions of Californians, the Port required the support of residents in neighboring communities for needed improvements in Port infrastructure. Order No. 6956 and Ordinance No. 179981 found that failure to significantly reduce the health and traffic impacts of Port operations on these communities would impede the Port's ability to handle increased volumes of goods in the future.  Order No. 6956 and Ordinance No. 179981 also cited concerns regarding vehicle safety (including vehicle maintenance, repair and replacement, and driver safety) and security (including reported cases of drivers presenting false credentials and counterfeit licenses to gain access to Port terminals) as motivations for the adoption of the Clean Truck Program and Concession Agreement.  Ex. 184, "BHC Order No. 6956"; Ex. 245, "Ordinance No. 17981."

71.    BHC Order No. 6956 sets forth the Board of Harbor Commissioners' concern that drivers with low incomes would lack the ability to properly maintain their trucks, thereby having a "negative effect on both the vehicle safety, as well as the air

emissions performance of vehicle engines and retrofits." Ex. 184, "BHC Order No. 6956."

72.     BHC Order No. 6956 states: "The Port drayage services business is highly competitive . . . .  As a result, the Board seeks to encourage evolution of the Port drayage market towards an asset-based market in which Licensed Motor Carriers that hold the motor carrier concessions also own the truck assets used to perform under the concession."  Ex. 184, "BHC Order No. 6956."

73.     BHC Resolution 6522 states: "Serious and long-standing problems exist as a consequence of the inadequate maintenance of the heavy duty trucks conducting Port drayage. . . .  Inadequate truck maintenance currently contributes to significant amounts of unnecessary emissions of air pollutants from drayage trucks while in operation on Port property.  The proper maintenance of truck air pollution control equipment will continue to be necessary to achieving the Port's clean air goals even after actions that the Port will take to replace older drayage trucks with newer, cleaner trucks and to retrofit trucks with emissions control devices. . . .  The Board also intends to protect the value of the Port's investments in Clean Trucks and in retrofit equipment, and finds that it can better protect such investments by (i) imposing maintenance and record-keeping requirements directly upon Concession motor carriers . . . ."  Ex. 185, "BHC Order No. 6522."

74.     According to the Board of Harbor Commissioners: "The Port needs to maintain political support and goodwill from the people living in surrounding communities. . . .  The Board therefore finds it necessary and desirable . . . to require that Concessionaires provide parking facilities which are adequate to allow parking for its Drayage Trucks when not in service."  Ex. 185, "BHC Order No. 6522."  Further, the off-street parking requirement "will address a problem raised by the community, i.e., heavy duty trucks parking in and driving through residential areas around the Port."  Ex. 224, "Approved POLA Staff Recommendations to BHC, 3/12/08."

75.     BHC Resolution 6522 found that serious safety and security problems

existed in connection with drayage trucks at the Port.  In particular, the Board of Harbor Commissioners cited statistics provided by Long Beach finding that, although heavy-duty vehicles accounted for about 21.3% of the vehicles present in the Long Beach Harbor District during the period January 1, 2005 through March 10, 2007, they accounted for 32.5% of traffic violations, 25.7% of accidents, and 81.7% of citations for improper maintenance.  Ex. 185, "BHC Order No. 6522."

76.    BHC Resolution 6522 also found that the Port lacked a readily accessible and reliable source that would provide identities and other personal information of truck drivers who have access to Port property.  In particular, the Board of Harbor Commissioners stated that a significant proportion of drivers who were then driving trucks on Port property appeared to lack valid (1) documents to establish personal identity; (2) documents establishing permission to work or conduct business in the United States; and/or (3) proper driver licenses.  The Board of Harbor Commissioners noted that the Port at the time lacked any reliable and practical method of enforcing driver requirements against individual truck drivers, and that, rather than enforcing requirements against individual drivers, it would be more practical and effective to require that motor carriers be responsible for enforcing such requirements on their drivers.  Ex. 185, "BHC Order No. 6522."

77.    BHC Resolution 6522 stated the Board of Harbor Commissioners' finding that "[a] Port drayage truck driver workforce comprised of more drivers assigned specifically to drayage at the Port would . . . improve overall drayage truck safety."  Ex. 185, "BHC Order No. 6522."

78.    BHC Resolution 6522 states the Board of Harbor Commissioners' finding that "safety hazards" caused by "truck traffic through the nearby neighborhoods . . . would be substantially reduced if drayage trucks serving the Ports were required to park in designated truck parking areas that are physically separated from residential areas."  Ex. 185, "BHC Order No. 6522."

79.    The Board of Harbor Commissioners concluded, in its formal Resolution

adopting the Concession program, that a Concession mechanism based on a employee-driver based business model would transform the market for drayage services into a "market characterized by the presence of fewer, generally larger, and more stable LMCs."  Ex. 185, "BHC Order No. 6522."

80.     In her March 20, 2008 presentation to the Board of Harbor Commissioners recommending adoption of the Concession mechanism, POLA's executive director wrote that under the proposed mechanism, "Total diversion [of container movements] will be approximately 3% based on rational economic decisions resulting from drayage price increases. . . .  Drayage price increases especially due to labor changes. . . . Asset-based LMCs with 100% employees creates barriers to entry."  Ex. 225, "Exec. Director's Presentation to BHC, 3/20/08."

81.     The Opinion of then Board of Harbor Commissioners President David Freeman states POLA's objectives in adopting the Concession program: "It is beyond debate that the existing system does not meet critical needs of the Port as a proprietor in three fundamental, crucial public interest needs: 1) cleaner air; 2) homeland security; and 3) a reliable work force that can implement needs 1) and 2)."  Ex. 128, "BHC Meeting Minutes, 3/20/10."  The president's Opinion was adopted as the Opinion of the Entire Commission.  Id.

**G.     POLA's Concession Agreement Requirements**

82.     The Board of Harbor Commissioners approved a form Concession Agreement contract on May 15, 2008, although this version was subsequently amended by formal Board action.  Ex. 139,  "BHC Meeting Minutes, 5/15/10."

83.     Subsequently, in 2008 and 2009, POLA implemented various funding and incentive programs to help motor carriers procure clean trucks.

84.     A 2008 incentive program attracted 2,200 privately-financed trucks meeting 2007 EPA emission standards to POLA and the Port of Long Beach, at a total cost to POLA of approximately $44 million.  To qualify for POLA's incentive program, trucks had to be privately funded and be committed to make a minimum of 300 trips per year at

POLA for a period of five years.  Ex. 231, "Press Release, 10/1/09"; Ex. 235, "Press Release 10/1/09."

85.   POLA also provided grants for the purchase of new 2007-compliant trucks to be used at the Port.  It is estimated that the grant program, which includes $12.5 million in Port funds, resulted in approximately 1,300 clean trucks being put into drayage service at the Port.  Ex. 261, "Resolution 09-6845."

86.   It is estimated that POLA helped to fund, through incentives and grants, approximately 35 percent of the drayage fleet that will serve the Port in 2010—a percentage that is in fact likely to increase.

87.   However, as of the fall of 2009, approximately 3,000 of the 5,500 clean trucks serving POLA were purchased without any subsidy from POLA, the Port of Long Beach, the SCAQMD, or the California Air Resources Board.  Ex. 231, "Press Release, 10/1/09"; Ex. 235, "Press Release 10/1/09."

88.   POLA also participated in a truck "preorder" program with the Port of Long Beach, under which the Ports negotiated with truck original equipment manufacturers and dealers to order and make available, for purchase by drayage truck owners operating at POLA and the Port of Long Beach, 2007-compliant trucks at volume-discounted prices.  Ex. 256, "Resolution 08-6569"; Ex. 299, "Staff Recommendation, Resolution No.08-6569."

89.   Also, in a joint initiative with the South Coast Air Quality Management District, the Port invested more than $1 million in developing an electric truck manufactured by Balqon Corporation for use in port drayage.  The Port itself purchased 25 electric trucks from Balqon, at least five of which are expected to be placed into drayage service at the Port.  Ex. 279, "White Article"; Ex. 301, "Staff Recommendation, "Resolution No.09-6742"; Ex. 304, "Agreement 266."

90.   On November 19, 2009, the U.S. Surface Transportation Board ("STB") approved an equipment pooling agreement between 10 drayage carriers serving POLA and the Port of Long Beach "that use either employee drivers or independent contractors

to operate their own vehicles, including clean trucks," so that they could share 626 carrier-funded trucks meeting the Ports' environmental standards.  The STB found that the pooling agreement "would give … smaller and mid-sized motor carriers greater access to clean trucks" and "serves the interest of better service to the public and efficiency of operation."  Ex. 192, "Surface Transportation Board Decision, 11/19/09."

91.     POLA's Concession Agreement contract requirement applies only to drayage service, and not to any of the many other services (e.g., stevedoring, rail transportation, marine terminal operation) needed for the Port's operations.  Ex. 181, "POLA Concession Agreement."

92.     It is undisputed that POLA's Concession Agreement requirements are directed only to motor carriers seeking to provide drayage services on trust land granted by the State.  Id.

93.     Prices charged by motor carriers performing drayage at POLA have not risen as a result of the concession contract requirement.  Motor carriers continue to provide drayage services at POLA despite the concession contract requirement, and they have not changed the services they provide to customers as a result of the concession contract requirement.  Ex. 176, "Holmes Decl."

**H.     Safety and Security Relating to Drayage Trucking at the Port**

94.     The Department of Homeland Security ("DHS") considers POLA and the Port of Long Beach to be one of seven port areas considered to be "Group I" port areas at the highest risk of terrorist attack.  Ex. 266, "Dep't of Homeland Security, FY 2009 Overview."

95.     It is undisputed that the Port plays a significant role in ensuring safety and security on Port property.  POLA is responsible for security functions that protect terminal facilities.  Two POLA Port Police boats patrol the Port's waterside.  POLA also conducts waterside surveillance to detect the presence of potential threats.  POLA has responsibility for safety and security with respect to geographical portions of the Port that are not leased to Marine Terminal Operators.

96.     POLA works jointly with various federal, state, and local agencies to secure the Port, including through the Central California Area Maritime Security Committee. POLA also has Memoranda of Understanding with Customs and Border Control and the United States Coast Guard for jointly protecting the Port.  Ex. 286, "Area Maritime Security Committee Charter"; Ex. 288, "MOI Between the City of Los Angeles and U.S. Customs and Border Protection"; Ex. 289,  "MOI Between the City of Los Angeles and U.S. Coast Guard."

97.     In order to implement its safety and security initiatives, POLA applies for federal and state security grants.  Through the first nine months of 2009, the Federal Government provided POLA with about $55 million in security grants, and the California Government provided POLA with about $26 million in security grants.  Ex. 287, "POLA Federal and State Port Security Grants."

98.     It is undisputed that prior to the Clean Truck Program, POLA had no system for (1) collecting information identifying the driver, the truck, the cargo, and the responsible company for each truck entering POLA's terminals; (2) correlating each piece of information with other pieces of information relating to a given truck visit; and (3) making one entity, the Licensed motor carrier, responsible for providing such information and verifying its accuracy.  Ex. 176, "Holmes Decl."

99.     In the course of the development of the Clean Truck Program, the Port commissioned studies that identified the approximately 16,000 heavy drayage trucks being driven in and out of the Port by unknown and unidentified drivers as a key security vulnerability.  Ex. 139, "BHC Meeting Minutes, 5/15/08"; Ex. 176, "Holmes Decl."

100.   It is undisputed that in one instance, the Port learned that a particular driver's license number was reported 46 times through a terminal gate in a single day, representing 23 trips to/from the Port.  The Port estimated that this number was approximately five times what would be typical for a single driver and thus likely resulted from several drivers using the same false identification.

101.   POLA requires that placards only contain a telephone number for reporting

concerns regarding truck emissions, safety, and compliance.  Ex. 181 ¶ III(l), "POLA Concession Agreement."

## I.    The Local Benefits of the Clean Truck Program

102.    In its first year, the Clean Truck Program reduced the rate of Port truck emissions by an estimated 70 percent.  It is expected that, by 2012, Port truck emissions will be reduced by more than 80 percent.  Ex. 217, "Holmes and Knatz Memorandum, 11/12/09"; Ex. 231, "Press Release, 1/01/09."

103.    In a June 2009 presentation to the U.S. Conference of Mayors, Mayor Villaraigosa stated that the POLA Clean Truck Program "[c]ost less with greater economic benefit than expected."  In particular, POLA was "bearing approximately 10% of program total cost, instead of anticipated 80% prior to implementation.  $44 million in port incentives have leveraged over $400 million in private investment."  Ex. 144, "Villaraigosa Presentation, 6/13/09."

104.    On October 1, 2009, Geraldine Knatz, Executive Director of POLA, declared "If ever there were a win-win air pollution initiative at our Port, the Clean Truck Program is it . . . [t]he air is substantially cleaner and continues to improve. Industry is responding by purchasing clean trucks and taking advantage of our incentive program. The trucking industry and our terminal operators have especially been instrumental in the success of this program, and the dollars generated in the purchase of all these news trucks are an added investment into the Southern California economy." Ex. 231, "Press Release, 1/01/09."

105.    According to statements issued by POLA, POLA officials estimate that by spring 2010 there would be between 6,500 and 7,000 trucks serving the ports that meet or exceed the U.S. Environmental Protection Agency 2007 heavy duty truck emissions standards.  These trucks were expected to make more than 90 percent of container pick-ups and drop-offs in early 2010.  This success was achieved while this Court's preliminary injunction against several provisions of the Concession agreements was in effect.  Ex. 232, "Press Release, 1/01/09."

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue

This action arises under the Constitution and Laws of the United States, including the Supremacy Clause of the Constitution, Article VI, clause 2; the Commerce Clause of the Constitution, Article I, Section 8, Clause 3; the FAAA Act, and as re-enacted by the Interstate Commerce Commission Termination Act of 1995, Public Law 105-88, as amended, (49 U.S.C. §§ 14501(c), 14504a(c), 14506);  42 U.S.C. § 1983; and the All Writs Act, 28 U.S.C. § 1651.  Accordingly, this Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C § 2201 (declaratory judgment).  This proceeding for declaratory and injunctive relief, damages, and attorney's fees presents an actual case and controversy within the Court's jurisdiction.

Venue is proper in this district under 28 U.S.C. § 1391(b).  The claims asserted in the complaint are based on conduct occurring in this district and each of the defendants maintains its offices and performs its duties within this district.

### B.   ATA Has Associational Standing to Bring This Action

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977); see also National Ass'n for Advancement of Colored People v. Ameriquest Mortg. Co., 635 F. Supp. 2d 1096, 1101-02 (C.D. Cal. 2009).

ATA meets these requirements:  ATA's members include licensed drayage motor carriers that would have standing to sue POLA on their own behalf; among the central purposes of ATA and its Intermodal Motor Carriers Conference are the protection of its members with respect to governmental regulation of prices, routes, and services; and the claim for constitutional violations and the requested relief do not require participation of

individual ATA members as parties, inasmuch as ATA seeks only injunctive relief.  See Warth v. Seldin, 422 U.S. 490, 515 (1975) (holding that injunctive relief will "inure to the benefit of those members of the association actually injured").  Therefore, ATA has established its standing to sue on behalf of its membership.

### C.      Preemption by the Supremacy Clause and the FAAA Act

#### 1.      Statutory Basis for Preemption

ATA argues that the Concession Agreement provisions at issue are preempted by the FAAA Act.  "Federal preemption occurs when: (1) Congress enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude the Congress left no room for state regulation in that field."  Tocher v. City of Santa Ana, 219 F.3d 1040, 1045-46 (9th Cir. 2000), abrogated on other grounds, Tillison v. City of San Diego, 406 F.3d 1126, 1127 (9th Cir. 2005).  When a statute provides a reliable indication that Congress intended to preempt state and local regulation, "the scope of federal preemption is determined by the statute."  Id. at 1046.

#### 2.      Preemption by 49 U.S.C. § 14501(c)(1)

Congress enacted the FAAA Act to achieve deregulation of the motor carrier industry, and therefore, included a "broad preemption statute."  Id.  The statute provides that, with regard to motor carriers, "a State, political subdivision of a State, or political authority of two or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier."  49 U.S.C. § 14501(c)(1).  Therefore, for a state regulation to be preempted under 49 U.S.C. § 14501(c)(1), the regulation must be "related to the price, route, or service of a motor carrier that transports property."  Toucher, 219 F.3d at 1047.  Relation to price, route, or service is found where "the regulation has more than an indirect, remote, or tenuous effect on the motor carrier's prices, routes, or services."  Id.

Congress' overarching goal in enacting the FAAA Act was to "help[] assure transportation rates, routes, and services that reflect 'maximum reliance on competitive

market forces,' thereby stimulating 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality.'" Rowe v. N. Motor Transp. Ass'n, 552 U.S. 364, 371 (2008) (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378 (1992)).  Even if the law at issue does not directly regulate motor carriers, but the effect of the regulation would be that carriers would have to offer different services than what the market would otherwise dictate or "freeze into place services that carriers might prefer to discontinue in the future," the regulation at issue has a sufficient effect on carrier services for preemption to apply.  See Rowe, 552 U.S. at 371-72 (finding that federal law preempts a Maine statute that forbids licensed tobacco retailers to employ a delivery service unless that service follows particular delivery procedures, because "the effect of the regulation is that carriers will have to offer tobacco delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate").

Because the Court may sever the preempted provisions from the Concession Agreement, the Court considers in turn each provision at issue to determine whether each may be subject to preemption because it is "related to the price, route, or service of a motor carrier."[6] See Am. Trucking II, 596 F.3d at 607 ("We affirm the district court's

─────────────────

[6]

 While ATA argues that the Concession Agreement "*per se*" affects routes and services by prohibiting non-Concessionaire motor carriers from providing drayage services to and from marine terminals at POLA, the Ninth Circuit's opinion in Air Transp. Ass'n of Am. v. San Francisco, 266 F.3d 1064, 1073-74 (9th Cir. 2001), appears to preclude a finding that the Concession Agreement has a *per se* effect on "routes" and "services." Similar to the FAAA Act, the Airline Deregulation Act provides that state and local governments "may not enact or enforce a law, regulation, or other provision having the force and effect of law relating to price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).  In Air Transport, the plaintiffs argued that a San Francisco ordinance requiring airlines that serve the San Francisco International Airport ("SFO") to comply with certain nondiscrimination provisions impermissibly affected airlines' routes and services because if the airlines did not comply with the provisions, they would not be able to fly to or from SFO.  266 F.3d at 1074.  However, the Ninth Circuit rejected this argument, finding that while "the Airlines will have to agree to abide by the

(continued...)

decision to sever the preempted provisions of the concession agreements."); see, e.g., New Hampshire Motor Transp. Ass'n v. Rowe, 377 F. Supp. 2d 197, 210-16 (D. Me. 2005) (analyzing each of three provisions under the FAAA Act individually, and finding two of the three to be preempted under section 14501(c)); Prof. Towing & Recovery Operators of Ill. v. Box, No. 08-4096, 2008 WL 5211192, at *9 n.7 (N.D. Ill Dec. 11, 2008).

### a.    The Employee Driver Provision

The evidence shows that the employee driver provision would affect motor carrier's routes or services, by prohibiting trucks driven by independent owner-operators from providing drayage services to and from marine terminals at POLA. See Toucher, 219 F.3d at 1047. Furthermore, the record demonstrates that the employee driver provision would significantly affect costs of drayage services. Ex. 183, "Husing Report," at 70-73; Ex. 191 (concluding that the employee driver provision would increase drayage operational costs by 167%); Ex. 191, "BCG Report," at 80 (estimating that the employee driver provision would add an estimated $500 million to the annual operating costs of Port drayage). It is further estimated that drayage services prices thus would need to increase, in part because of the employee driver provision. Ex. 183, "Husing Report," at 70-73; see also Ex. 225, "POLA Executive Director's Presentation to the BHC," (forecasting that drayage services pricing would increase "especially due to labor changes"). Therefore, the evidence shows that at least some of the increased costs of drayage services caused by the employee driver provision will impact drayage

---

[6](...continued)
Ordinance's nondiscrimination requirements as a 'cost' of maintaining their leases at SFO," the ordinance did not "compel[] or bind[] [the Airlines] to a particular price, route or service." Id. ("The question is not is not whether the Ordinance compels or binds them into not discriminating; the question is whether the Ordinance compels or binds them to a particular price, route, or service."). Similarly, in the present action, the motor carriers continue to be free—as they were before the adoption of the Clean Truck Program—to decide whether to perform drayage services at the Port, but a decision not to do so does not, under Air Transport, affect their "routes" or "services."

pricing, causing it to increase.  Accordingly, the Court finds that 49 U.S.C. § 14501(c)(1) preempts the employee driver provision, unless POLA demonstrates that an exception to preemption applies.

### b.    The Off-Street Parking Provision

The evidence in the record shows that the off-street parking requirement would probably affect motor carriers' prices, routes, or services.  See Toucher, 219 F.3d at 1047.  While at least two of ATA's local motor carrier witnesses already provide off-street parking for trucks operating under their authority (Apr. 21 Tr. at 178:18-25 (Owen); Apr. 22 Tr. at 153:24-154:1 (Johring)), the record indicates significant increased costs to motor carriers associated with parking off the street.  See Apr. 21 Tr. at 179:1-11 (Owen) (testifying that the use of property for parking purposes would constitute a lost opportunity for revenue generation for motor carriers); Ex. 183, "Husing Report," at 70-73 (estimating that the cost to motor carriers of complying with the off-street parking requirement would average $21,237 per truck).[7]  Because motor carriers would likely incur high costs to obtain off-street parking for trucks, and because they already operate quite leanly, these costs will likely be passed on to customers in the form of higher prices for drayage services.  See Ex. 183, "Husing Report," at ii (finding that intense competition between the motor carriers results in average returns on their revenues of just 5%).  Moreover, because this provision alters where motor carriers must locate their trucks between drayage movements, this implicates routes and services.  Accordingly, this provision is preempted by 49 U.S.C. § 14501(c)(1).

### c.    The Maintenance Provision

The record contains no evidence that the maintenance provision would have "more than an indirect, remote, or tenuous effect on the motor carrier's prices, routes, or services."  See Toucher, 219 F.3d at 1047.  Indeed, several of ATA's licensed motor carrier witnesses have already prepared and submitted maintenance plans to the Port, and

---

[7] While the Husing Report is not clear, it appears that this is an annual cost.

these witnesses testified that preparation of such plans did not take much time and did not give rise to any significant additional costs.  See Apr. 22 Tr. at 13:10-18 (Owen); Apr. 22 Tr. at 155:2-13 (Johring).  Moreover, licensed motor carriers are already responsible under federal regulations for the safety of all trucks operating under their authority, and thus this requirement should not have any additional effect on their prices, routes, or services.  Apr. 20 Tr. at 207:10-25 (Sandberg); Apr. 21 Tr. at 181:4-18 (Owen).  Accordingly, ATA has failed to show that the maintenance provision is preempted by 49 U.S.C. § 14501(c)(1).

### d.    The Placard Provision

ATA has put forth no evidence demonstrating how the requirement that trucks bear a placard containing an 800-number for the public to call would affect the prices, routes, or services of motor carriers.  Accordingly, ATA has failed to show that the placard provision is preempted by 49 U.S.C. § 14501(c)(1).

### e.    The Financial Capability Provision

Testimony by ATA's licensed motor carrier witnesses concerning the financial capability provision indicates that the provision would have no effect on prices, routes, or services.  See Apr. 21 Tr. at 185:8-15 (Owen) (testifying that the requirement would have no adverse impact on licensed motor carrier's business operations); Apr. 22 Tr. at 51:8-22 (Patterson).  Accordingly, ATA has failed to show that the financial capability provision is preempted by 49 U.S.C. § 14501(c)(1).

### 3.    Exceptions to Preemption

POLA contends that even if ATA can show that 49 U.S.C. § 14501(c)(1) would function to preempt any of the Concession Agreement provisions at issue, the provisions are exempted from preemption for three reasons, each of which would be sufficient to defeat preemption.  First, POLA argues that the provisions are exempt from preemption under the FAAA's statutory safety exception.  Second, POLA posits that the provisions are not preempted because the Ports reside on sovereign tidelands, and Congress has not evinced an intent to deprive the states of their sovereignty over these lands.  Third,

POLA argues that the provisions are not preempted by reason of the market participant exception to preemption.  The Court finds that the safety exception functions to exempt some of the provisions at issue, the market participant exception exempts the Concession Agreement provisions entirely, and the tidelands exception is not applicable.

### c.    The Safety Exception

The provision of the FAAA preempting state regulation "related to the price, route, or service of a motor carrier that transports property," contains an express safety exception to preemption.  See 49 U.S.C.§ 145019(c).  Specifically, this section provides that the preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization."  49 U.S.C.§ 14501(c)(2)(A).

The United States Supreme Court has held that, in order to fall within the safety exception, a statute, regulation, or provision must be "genuinely responsive to safety concerns."  City of Columbus v. Ours Garage and Wrecker Service, Inc., 536 U.S. 424, 442 (2002).  In other words, a regulation does not fall under the safety exception if it is an economic regulation under the guise of a safety regulation.  Id.  The Supreme Court has also held that the "narrowest possible construction of the exception" is "surely resistible," because the FAAA Act's preemption rule and the safety exception "do not necessarily conflict."  Ours Garage, 536 U.S. at 441.  Instead, the safety exception "seeks to save from preemption state power 'in a field which the States have traditionally occupied.'"  Id.

In Am. Trucking I, 559 F.3d at 1054, the Ninth Circuit noted that there is "no bright line test for what is related to vehicle safety" and that the Court is required to ask whether the regulator was "acting out of safety concerns."  Id., citing Tillison, 406 F.3d at 1129.  The Court held that "[i]t is not enough to say that the provision might enhance

efficiency, or reduce some kind of negative health effects.  The narrow question, again, is whether the provision is intended to be, and is, genuinely responsive to motor vehicle safety."  Id. at 1055.  The Court therefore stated that "even if some kind of general public health concerns are (or may be) involved in a statute or regulation . . . that alone does not bring the regulation within the ambit of the motor vehicle safety exception."  Am. Trucking I, 559 F.3d at 1054.  Because the Court may sever the preempted provisions from the Concession Agreement, the Court considers in turn each provision at issue to determine whether each may fall within the ambit of the safety exception.  See Am. Trucking II, 596 F.3d at 607.

### i.    The Employee Driver Provision

ATA argues that POLA was not acting out of safety concerns in enacting the employee driver provision of the Concession Agreement, and thus that it does not fall within the ambit of the safety exception.  The Ninth Circuit previously held that "the independent contractor phase-out provision is one highly likely to be shown to be preempted."  Am. Trucking I, 559 F.3d at 1056.  Specifically, the Ninth Circuit stated:

> the Port of Los Angeles Concession agreement mandates the phasing out of thousands of independent contractors (many or most of them small businessmen who own their own trucks).  In an attempt to justify this, the Port argues that there are '[s]erious and longstanding safety problems' because of 'unsafe, negligent or reckless driving' that has subjected the Port to 'a risk of financial liability and moral culpability for failure to act to control actions by third parties.'  Those concerns would allegedly be ameliorated because requiring employee drivers will provide 'control [to] the concessionaires as employers of their employee drivers to a degree not possible with casual or independent drivers.'  We see little safety-related merit in those threadpaper arguments, which denigrate small businesses and insist that individuals should work for large employers or not at all.  As it is, the record demonstrates that the Ports' primary concern was increasing

1

2

efficiency and regulating the drayage market.

Id. at 1055-56.

3

4

5

6

7

8

9

10

On remand, this Court enjoined the provision, finding that "based on the holding of the Ninth Circuit, and because it appears that this provision is addressed to concerns unrelated to motor vehicle safety, the Court finds that ATA is likely to succeed on the merits in showing that the provisions of the POLA Concession Agreement dealing with the independent operator phase-out are preempted under the FAAA Act, and do not fall within the scope of the safety exception." Am. Trucking Ass'ns, 2009 WL 1160212, at * 7.  For the same reasons, the Court again finds that the provision does not fall within the safety exception.

11

### ii.    The Off-Street Parking Provision

12

The Ninth Circuit previously addressed this requirement, finding that:

13

14

15

16

17

18

19

20

it is likely that the on-street parking ban in the Port of Los Angeles Concession Agreement is not genuinely responsive to safety. While restrictions on parking could be responsive to the safety of drivers and individuals in the surrounding neighborhoods in some sense (though it is not clear how), the Port of Los Angeles bans trucks from parking legally on streets where other trucks are free to park. Thus, any potential safety rationale for restricting on-street parking is seriously undermined, and it is likely that this provision would not withstand scrutiny.

21

22

23

24

25

26

27

28

Am. Trucking I, 559 F.3d at 1056-1057.  On remand, this Court subsequently enjoined the provision, finding that "the parking provisions contained within the Concession agreements are insufficiently related to motor vehicle safety so as to fall within the safety exception." Am. Trucking, 2009 WL 1160212, at *10.  While POLA puts forth some evidence that this provision is responsive to safety by removing trucks from residential streets where they may block sight lines and make the neighborhoods less dangerous for children, the Court finds that the provision was predominantly enacted for community relations reasons, to mollify residents in the area surrounding the Port who

were unhappy with the presence of a large number of trucks in their neighborhoods.  See Apr. 23 Tr. at 103-105 (Holmes).  Accordingly, the Court again concludes that the provision does not fall under the safety exception to the FAAA Act.

### iii.    The Maintenance Provision

This Court has previously found that the maintenance provision does not affect prices, routes, or services.  However, even if the FAAA Act could be said to apply, the Court nonetheless concludes that the maintenance provision falls within the safety exception.  While ATA argues that the maintenance provision does not fall within the ambit of the safety exception, this Court found to the contrary in its order dated April 28, 2009, because it "agree[d] with defendants that, while the[] provision[] may certainly be responsive to environmental concerns, [it is] also 'genuinely responsive to motor vehicle safety.'"[8] Am. Trucking, 2009 WL 1160212, at * 14 (citing Am. Trucking I, 559 F.3d at 1055).  This Court further concluded that "[r]equiring routine truck maintenance will no doubt help to ensure that drayage trucks are operating properly and safely, which  will in turn likely prevent motor vehicle accidents." Id.  The Court finds that at trial, the evidence put forth by POLA supported its prior conclusions, and thus the Court again concludes that this provision falls within the safety exception of the FAAA Act.

### iv.    The Placard Provision

This Court has previously found that the placard provision does not affect prices, routes, or services.  However, even if the FAAA Act could be said to apply, the Court nonetheless concludes that the placard provision falls within the safety exception.  In its order dated April 28, 2009, this Court found that "[t]he primary motivation behind the placards does appear to be motor vehicle safety, in that it provides a mechanism for individuals—including other operators of trucks accessing the Ports—to report unsafe

---

[8]  Even though this Court concluded, supra, that the maintenance, placard, and financial capability provisions do not affect the "price, route, or service" of motor carriers and thus that the provisions are not preempted by the FAAA, the Court still considers the question of whether they fall within the safety exception.

driving or other dangerous activity to the proper authorities." <u>Am. Trucking</u>, 2009 WL 1160212, at \*17.  While the Ninth Circuit later vacated this ruling and remanded in order for this Court to consider the preemptive effect of 49 U.S.C. § 14506(a), the Court <u>infra</u>, finds that this statute does not preempt the placard requirement.  <u>See</u> <u>Am. Trucking II</u>, 596 F.3d at 606.  Furthermore, the Court finds that the evidence at trial demonstrates that the placard provision falls within the safety exception, as the placard "refers members of the public to a phone number to report concerns regarding truck . . . safety . . . "  <u>See</u> Apr. 22 Tr. at 64-65 (Patterson); Ex. 326.  The Court is not persuaded by ATA's argument that the public may become confused by the placard—and therefore safety would be compromised—if multiple jurisdictions enacted similar requirements, as no witness was aware of any jurisdiction that had enacted such a requirement.  <u>See</u> Apr. Tr. at 90-91 (Sandberg).  Accordingly, the Court concludes that the provision falls within the ambit of the safety exception to the FAAA Act.

### v.    The Financial Capability Provision

As set forth above, the Court concludes that the financial capability provision does not affect prices, routes, or services.  ATA disagrees, and further argues that the financial capability provision does not fall within the ambit of the safety exception.  In <u>Am. Trucking I</u>, 559 F.3d at 1056, the Ninth Circuit agreed with ATA, stating:

> it is not likely that the financial disclosure requirements in both Ports' agreements could be justified under any conceivable safety rationale. Those provisions require disclosures of annual reports, SEC filings, balance sheets, income tax statements, and pending legal actions. The Ports make no effort to explain how a motor carrier's financial viability touches at all on the safety of the motor vehicle.

After the case was remanded, this Court enjoined the provision, finding that "[b]ased on the record before the Court, it cannot conclude that th[is] provision[ is] likely to fall within the safety exception."  <u>Am. Trucking</u>, 2009 WL 1160212, at \*9.  At trial the evidence demonstrated that the financial disclosure provision may have been enacted, in

some part, due to safety considerations, in that a financially viable motor carrier may be less likely to cut corners regarding safety out of economic necessity.  See Apr. 23 Tr. at 116:16 - 117.7 (Holmes) (testifying that improper maintenance can lead to material safety deficiencies); Apr. 28 Tr. at 83 (Brown).  However, the requirement appears primarily intended to ascertain that companies providing drayage services at the Port are financially stable, so that the Port can be certain that the companies have the means to maintain their trucks and the Port will not lose its investment in truck grants.  See Apr. 23 Tr. at 85 (Holmes).  Accordingly, after reviewing the evidence the Court concludes that, should the financial capability provision affect prices, routes, or services and thereby comes within the ambit of the FAAA Act, then this provision is not "genuinely responsive to safety concerns."  See City of Columbus, 536 U.S. at 442.  Thus it fails to fall within the safety exception to the FAAA Act.  Id.

### b.   The Tidelands Exception

POLA contends that the Port sits on the sovereign tidelands of San Pedro Bay, and on that basis claims that the preemptive force of Section 14501(c)(1) does not apply to the Concession Agreement.  However, a state's power over beds of navigable waters such as tidelands, "remains subject to only one limitation: the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce."  Montana v. United States, 450 U.S. 544, 551 (1981).  Based on the Supreme Court's decision in Montana, this Court previously found that POLA's control over its tidelands "is not absolute . . . . Congress's power to regulate interstate commerce over navigable waterways supersedes the state's plenary control."  Am. Trucking, 577 F. Supp. 2d at 1119.  Further, Ninth Circuit precedent contradicted POLA's theory where, as this Court observed, the Commerce Clause "preempted regulations by a state regarding leasing of sovereign tidelands."  Id. (citing Western Oil & Gas v. Cory, 726 F.2d 1340, 1343 (9th Cir. 1984)).  For these reasons, this Court previously held, and the Ninth Circuit affirmed, "that the fact that the Ports sit on sovereign tidelands does not exempt them from preemption under the" FAAA Act.  Id., aff'd in part, 559 F.3d at 1053.  Because

POLA has not presented any additional facts that bolster its theory, the Court concludes that the sovereign tidelands exception does not exempt the Concession Agreement from preemption under the FAAA Act.

### b.    The Market Participant Exception

POLA contends that the Port was acting as a proprietor—the owner of a business—when it enacted the Clean Truck Program, of which the Concession Agreement under challenge here is a part, and thus the market participant doctrine protects the Concession Agreement provisions against ATA's FAAA Act and Dormant Commerce Clause challenges.  The market participant doctrine distinguishes between the role of the state or local government as a regulator and its role as a market participant.[9] Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist., 498 F.3d 1031, 1040-41 (9th Cir. 2007) ("Not all actions by state or local government entities . . . constitute regulation, for such an entity, like a private person, may buy and sell or own and manage property in the marketplace.").  In cases of statutory preemption, "the market participant doctrine is based on the proposition that 'pre-emption doctrines apply only to state *regulation*.'" Id. at 1040 (emphasis added).  Therefore, if state action is *proprietary*, rather than regulatory, such action is not generally subject to statutory preemption.  Id.  Although the scope of the doctrine may vary depending on the federal statute at issue, "the Court will not 'infer' preemption of proprietary action unless Congress "indicat[es] . . . that a State may not manage its own property when it pursues

---

[9] The doctrine originated in a series of Commerce Clause cases, starting with the Supreme Court's decision in Hughes v. Alexandra Scrap Corp., 426 U.S. 794 (1976). See Reeves, Inc. v. Stake, 447 U.S. 429 (1980); White v. Mass. Council of Constr. Employers, Inc., 460 U.S. 204 (1983).  Since that time, the Supreme Court and circuit courts have applied the market participant doctrine to uphold state action that would otherwise be preempted by federal law so long as the action is proprietary rather than regulatory in nature.  Importantly, the doctrine has been applied by the Ninth Circuit to protect state action against a federal preemption challenge under Section 14501(c)(1) of the FAAA Act. See, e.g., Tocher, 219 F.3d at 1048.

1    its purely proprietary interests." Id. at 1044.

2         The Ninth Circuit has held that state action qualifies as proprietary in either of two
3    circumstances.  "First, state action is proprietary if it 'essentially reflect[s] the
4    [governmental] entity's own interest in its efficient procurement of needed goods and
5    services, as measured by comparison with the typical behavior of private parties in
6    similar circumstances.'" Engine Mfrs., 498 F.3d at 1041.  "In these circumstances, the
7    market participant doctrine protects comprehensive state policies with wide application
8    from preemption, so long as the type of state action is essentially proprietary." Id.
9    (internal quotations omitted).  Second, "state action is proprietary if 'the narrow scope of
10   the challenged action defeat[s] an inference that its primary goal was to encourage a
11   general policy rather than address a specific proprietary problem.'" Id.  This test
12   "protects narrow spending decisions that do not necessarily reflect a state's interest in
13   the efficient procurement of goods or services, but that also lack the effect of broader
14   social regulation." Id.  Each of the two tests "constitutes a separate method of
15   determining whether the state action at issue actually constitutes regulation." Chamber
16   of Commerce v. Lockyer, 463 F.3d 1076, 1084 (9th Cir. 2006).  Because the Court finds
17   that POLA's action in implementing the Concession Agreement qualifies as proprietary
18   under the first test, the Court finds it unnecessary to consider the second test.

19                    **i.    What Constitutes Proprietary State Action**

20         POLA argues that its action in requiring motor carriers to enter into the
21   Concession Agreement was proprietary.  However, ATA contends that it does not fall
22   within the ambit of the market participant exception because POLA does not itself
23   purchase drayage services or otherwise directly participate in the drayage services
24   market.  As a preliminary matter, and contrary to ATA's arguments, the Court finds that
25   the Port need not be a purchaser of drayage services to establish that its action in
26   entering into the Concession Agreement is proprietary in nature.  Indeed, while the first
27   prong of the Ninth Circuit's market participant test is articulated in terms of
28   "procurement," case law demonstrates that the market exception applies in cases where

the government is acting as a proprietor would even though it is not buying anything.

In Alexandria Scrap, which involved a challenge to Maryland's scrappage incentive program for old, abandoned vehicles, commonly referred to as "hulks," the state was not itself a purchaser or a seller.  426 U.S. at 796.  Maryland's program included documentation requirements to obtain monetary incentives for scraping hulks that discriminated against out-of-state vehicle scrap processors.  Id. at 800-01.  The Supreme Court upheld the documentation requirements under the market participant exception, even though Maryland itself was neither the purchaser nor seller of hulks.  Id. at 808-10.  In Tocher v. City of Santa Ana, the Ninth Circuit upheld a challenge under the FAAA Act to the city's tow truck company list that governed which towing companies the city's police force would call upon to impound vehicles.  219 F.3d at 1049.  The Ninth Circuit held that the list fell within the market participant exception even though vehicle owners, not the city, paid for the towing services.  Id. at 1043, 1049.  In EMA v. SCAQMD, the Ninth Circuit applied the market participant exception to protect local air district regulations that were promulgated pursuant to state authority that required fleet operators with substantial operations in the Los Angeles region to purchase vehicles that used alternative fuels.  498 F.2d at 1035, 1045.  The requirements applied not only to state and local air district purchases of vehicles, but to purchases made by every state, county, city, or governmental department or agency, and special districts such as water, air sanitation, transit, and school districts.  Id. at 1036-37.  EMA v. SCAQMD thus dealt with regulation that dictated the purchases made by other governmental entities.  Further, in Four T's, Inc. v. Little Rock Mun. Airport Com'n, 108 F.3d 909, 913 (8th Cir. 1997), and Transport Limousine of Long Island, Inc. v. Port Auth. of N.Y. and N.J., 571 F. Supp. 576, 581 (E.D. N.Y. 1983), the market participant exception was applied to protect fees charged by local airports on ground transportation service operators.  Neither case involved the purchase by the government agency of transportation services, but the fees were upheld because the agency provided facilities to the ground transportation companies.  Id.; see also Crescent City Towing and Salvage

Co., Inc. v. Ormet Corp., 720 So. 2d 628 (La. 1998) (holding that a publicly owned port that leased a terminal to a private company acted as a market participant when it required the use of specified tugboats in towing ships to the terminal in question, even when it did not itself purchase tugboat services, because it was "seek[ing] to facilitate and improve the overall efficiency and profitability of terminal operations," and thus the market participant doctrine applied to a challenge by a group of tugboat operators who had not been able to secure such contracts).

Accordingly, where restrictions are placed on services essential to the functioning of a government-run commercial enterprise, the market participant exception applies to non-procurement decisions. These cases hold that the first prong of the Ninth Circuit's market participant test does not turn on whether the state or local government is a purchaser or seller of the goods and services at issue. While traditional procurement may very well be the most obvious instance of proprietary action, it is not the only instance.[10] Indeed, a landlord or facilities operator, such as the Port, that does not procure anything, can still take a proprietary action if it is action in pursuit of profit maximization—as a private company would act rather than as a regulator—by limiting access to its land and facilities.

_____

[10] The Court notes that the Ninth Circuit in EMA v. SCAQMD cautioned against a mechanical application of the market participant exception:

> Due regard for congressional intent requires that we not mechanically apply our market participant analysis in Lockyer to preemption analysis of federal statutes other than the NRLA. Depending on Congress's intent, another statute might require us to employ a definition of protected state "proprietary action" different from the two definitions adopted on Lockyer. . . Nevertheless, in the case before us, we need not consider other possible definitions of "proprietary action," for the Fleet Rule provisions . . . fall squarely within Lockyer's first category of state proprietary action. That is these provisions "essentially reflect the state entity's own interest in its efficient procurement of needed goods and services . . . ."

498 F.3d at 1045.

Second, the Court rejects ATA's contention that the Port itself must participate directly in the drayage market.[11]  Rather, the Port's participation in the port services market is sufficient for its actions in managing its drayage partners to be proprietary, inasmuch as such actions advance its economic interests as a provider of port services. See Crescent City Towing, 720 So. 2d at 628 (holding that a port acted as a market participant in seeking to "improve the overall efficiency and profitability of terminal operations" when it required the use of specified tugboats in towing ships to the terminal, even though it did not directly participate in the market for tugboat services); Four T's, 108 F.3d at 913 (holding that an airport acted as a market participant when it charged concession fees on car rental companies even though the airport did not directly participate in the car rental service market); Transport Limousine, 571 F. Supp. at 581.

---

[11] ATA contends that Justice White's opinion for the plurality in South Central Timber Dev. Co. v. Wunnicke, supports its argument that because POLA does not directly participate in the drayage market, the market participant exception cannot apply here, in that the plurality opinion would hold that the market should be "relatively narrowly defined," and that "[t]he limit of the market participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further." 467 U.S. 82, 89 (1984). The Court notes that because Justice White's opinion on the market participant doctrine was supported only by a plurality of the Supreme Court justices, it is not binding. Furthermore, the Court reads Wunnicke to support its holding here, because the Port is imposing burdens on the narrowly defined market for Port services within which it participates as a landlord and facilities operator. See id.

POLA also argues that it is a direct participant in the drayage services market, because, similar to the incentives provided by the state of Maryland in Alexandria Scrap, it has provided $44 million of its own funds in monetary incentives to motor carriers for the purchase of clean drayage trucks, has spent $12.5 million to subsidize the purchase of drayage trucks, has itself paid over $1 million to develop and procure electric trucks for Port drayage, and has worked to ensure an adequate supply of cleaner trucks at a discounted price from truck manufacturers. See 426 U.S. at 796. Because the Court finds the market participant exception applies under the first prong to its actions as a provider of port services, as noted above, it need not decide whether POLA is a purchaser or participant in the drayage services market.

### ii.      The Port's Action Was "Essentially Proprietary"

The Port's adoption of the Concession Agreement as a whole is an "essentially proprietary" action under the market participant doctrine, because the Port took the action in order to sustain and promote Port operations.  The Concession Agreement helps the Port manage its property and facilities as any private landlord and facilities operator would.  See EMA, 498 F.3d at 1041 (holding that government entities, like a private person, may manage their property in the marketplace).  Indeed, through the Concession Agreement, POLA aims to secure the provision of responsible motor carrier services that are necessary for the maintenance and growth of its commercial operations. The Port, a self-sustaining landlord and operator of a commercial enterprise that competes with other West Coast and North American ports, earns its revenues by charging fees for services and infrastructure provided to its tenants (or customers)—shipping lines and stevedoring companies.  Apr. 27 Tr. at 175:1-15 (Towsley).  As cargo volumes rise, Port revenues increase, and thus to remain competitive the Port has a strong interest in upgrading and expanding its facilities to increase cargo volumes. Ex. 184 at LAD000341; Apr. 27 Tr. at 175:16-177:4 (Towsley).

However, the evidence demonstrates that Port-generated air pollution interfered with Port growth and has jeopardized the Port's continued viability as a commercial enterprise.  The evidence shows that increased diesel particulate matter emissions from drayage trucks, combined with other operations at the Ports, created elevated health risks for those that live in local communities surrounding the Port, including a cancer risk that is sixty percent higher than the average cancer risk outside that area.  See Ex. 184 at LAD00341; Apr. 23 Tr. at 15:16-21.  In response, beginning as early as 2001, the NRDC and a coalition of community groups successfully organized to stop all Port expansion projects for failing to mitigate significant air pollution generated by the projects.  The costly litigation and administrative appeals brought by these groups combined with increasing public concern over the air pollution generated by the Port effectively stalled

all major Port expansion projects for seven years during a decade of exponential cargo growth at ports nationwide.  Apr. 28 Tr. at 130:3-10 (Knatz); Apr. 27 Tr. at 177:19-179 (Towsley).  In response, in order to be able to grow, the Port enacted the Clean Air Action Plan, which spawned the Clean Truck Program and the Concession Agreement, to mitigate Port-generated air pollution from Port-serving vehicles and equipment.[12]  See Ex. 184 at LAD000341.  For example, according to David Freeman, the former President of POLA's Board of Harbor Commissioners,

> we quickly realized that in order to grow the Port, we had to abate the pollution because the people in San Pedro and Wilmington were not only angry and not only suffering from terrible air pollution, but they had learned that the law was there to protect them, and the NRDC and others had filed lawsuits, and they had stopped the Port from growing.  So green growth which is what we called it was an absolute business necessity . . . . [W]e responded with what we call our Clean Air Action P[lan], and it was a business necessity.  I mean, we could not grow the business without attacking the pollution problem . . . .

Apr. 27 Tr. at 46:6-48:3 (Freeman); see also Apr. 27 Tr. at 177:19-179 (Towsley).

Accordingly, the Court finds that in response to litigation and the threat to POLA's continued economic viability by community groups, as part of the Clean Air Action Plan the Port adopted the Clean Truck Program, which included the Concession Agreement as a "business necessity," in order to eliminate evident obstacles to its growth.  See Apr. 28 Tr. at 117:18-121:24 (Knatz); Apr. 27 Tr. at 46:6-20 (Freeman).  Thus, the Concession Agreement provisions, which were designed as part of the Clean Truck Program in response to litigation and well-organized pressure from the local community, are also proprietary.  While the Port had not previously required drayage

---

[12] The evidence shows that the existing drayage system did "not meet the critical needs of the Port as a proprietor" with respect to homeland security, safety, and a reliable workforce.  Ex. 128 at LAD008175-78 (quoting Boston Harbor, 507 U.S. at 231-32).

services providers to contract with it to access Port property, it made an economically driven decision to do so via the Concession Agreement in its capacity as a landlord and facilities operator.[13]  See Bldg. & Constr. Trades Council v. Assoc. Bldrs. & Cont., ("Boston Harbor"), 507 U.S. 218, 231-32 (1993) ("In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction.") (upholding a state requirement that all contractors on a public construction project adhere to a pre-hire labor agreement).  Ex. 185 at LAD001212.  Accordingly, the market participant exception to preemption applies to the Concession Agreement as a whole.

While the Court finds that the Port's requirement that motor carriers enter into the Concession Agreement is proprietary, the Court also finds that POLA included each provision at issue in the Concession Agreement based on detailed analysis and arms' length negotiation to assuage specific concerns of the litigants and the community, and thus each serves as a requirement for Port expansion.[14]  As a result, each individual

---

[13] Consequently, the Court concludes that the facts now more fully developed suggest that the Port presents different government interests than in Aeroground, Inc. v. City & County of San Francisco, 170 F. Supp. 2d 950 (N.D. Cal. 2001), and Florida Transp. Serv. Inc. v Miami-Dade County, 543 F. Supp. 2d 1315 (S.D. Fla. 2008), upon which this Court relied in its initial preliminary injunction ruling.  Unlike the government entities in those cases, the Port has made a very significant financial investment in the services at issue.  Furthermore, Alexandria Scrap makes clear that the Port can attach conditions on incentives or subsidies it provides.  See 426 U.S. at 808-10.

[14] The recent lawsuit against the Port of Long Beach in the related case Natural Resources Defense Council, Inc. v. City of Long Beach, No. CV10-826 CAS (PJWx), demonstrates that POLA required that motor carriers enter into the Concession Agreement in order to placate specific concerns of the groups that had previously initiated litigation against the Port and thereby stalled its growth.  This lawsuit was filed by environmental and community groups based on the Port of Long Beach's settlement with ATA, which effectively eliminated several requirements from its port access agreements with motor carriers that are similar to those at issue in the instant case.

provision can be deemed proprietary.  The Court nevertheless briefly considers each provision on its individual merits as well.

### iii.     Concession Agreement Provisions at Issue

The Ninth Circuit concluded that "requiring concession motor carriers to use only their own employees for truck drayage at the Port will contribute to the administrative efficiency and reduce the cost of the Clean Truck Program."  Am. Trucking I, 559 F.3d at 1056.  Regarding the provision, the Ninth Circuit further found that Port adopted the provision because

> the employee model "is the easiest model to administer" because of the "administrative cost of maintaining up-to-date records" for tens of thousands of independent contractors. . . .  Furthermore, the Port felt that its insistence on that particular employment structure would ensure that the Ports' "investments" in retrofitted trucks "will be better protected" because "Concession motor carriers use only their own employee[s] to drive Port-funded trucks."  The Los Angeles Board also sought to alter the allocation of costs.  It said that for independent contractors, the costs are externalized, but if they were employees, the costs would be borne by their motor carrier employers.

Id.

As recognized by the Ninth Circuit, the employee driver provision was designed to transfer the financial burden of administration and record-keeping onto the trucking companies instead of the Port.  This is clearly an economically motivated action, and one that a private company with substantial market power—such as the oligopoly power of the Port—would take when possible in pursuit of maximizing profit.  The provision was also designed to help protect the Port's investment in retrofitted trucks.[15]

---

[15]  Similarly, the Court finds that the Port's concern regarding ensuring that the Port was provided with a reliable workforce of drayage truck drivers was market-driven.

While ATA contends that other less sweeping alternatives exist to address the Port's safety and environmental concerns, the existence of alternatives to the employee driver provision is irrelevant to whether the provision addresses a valid proprietary interest.[16]  The market participant doctrine does not require the government to demonstrate that its solution is the "perfect" remedy for its proprietary problem.  White, 460 U.S. at 210 (claim that the city requirement "sweeps too broadly, creating more burden than is necessary to accomplish [the city's] stated objectives" was "no help" in deciding whether the market participant exception should apply).  Furthermore, the evidence established at trial that under the existing regulatory scheme, 16,000 dirty and unsafe trucks served the Port before implementation of the Clean Truck Program, and expert testimony confirmed that the economics of an independent owner-operator based drayage system creates perverse incentives for independent owner-operators to skimp on maintenance required to protect the Port's investment in retrofitting trucks.  See Apr. 27 Tr. at 56:11-25 (Freeman); Apr. 28 Tr. at 73:20-77:2 (Brown).  Consequently, the weight of evidence demonstrates that the employee provision was adopted to conserve administrative costs of the Clean Truck Program and protect the Port's investment in clean trucks.[17]

---

[16] For example, ATA argues that the Port did not need the employee driver provision because existing federal regulations hold motor carriers equally accountable for employee and independent owner-operator conduct, and further that the Port's safety and environmental concerns could be addressed through additional enforcement of existing regulations—that is, by greater inspection of port trucks by the Port, and by reporting licensed motor carrier misconduct to federal authorities. Apr. 21 Tr. at 36:22-37:11, 33:11-34:16 (Sandberg); Apr. 20 Tr. at 140:5-141:19 (Whelan).

[17] In addition, ATA argues that the Clean Truck Program has been a success even though several Concession Agreement provisions were enjoined by this Court, and thus that the employee driver provision is unnecessary to fulfill the Port's environmental objectives. However, the enjoined provisions of the Concession Agreement ensure that the early success of the Clean Truck Program is secured for the long-run.  See, e.g., Apr. 27 Tr. at 72:7-11, 101:24-102:10 (Freeman).

The Court further finds that both the off-street parking and placard provisions were designed specifically to generate goodwill among local residents and to minimize exposure to litigation from them, and they come at no financial cost to the Port. See Ex. 185 at LAD001213; Apr. 28 Tr. at 29:10-30:8 (Hall); Apr. 28 Tr. at 81:4-14 (Brown). Moreover, both the financial capability and maintenance provisions are aimed to ensure that the trucking companies had the resources to sustain the Port's investment in cleaner trucks, and would adhere to the manufacturers' maintenance standards, thereby protecting the Port's investments in cleaner trucks in the long term.[18]  See Ex. 128 at LAD008177 ("[T]he Port cannot buy people new trucks every five years . . . .  It is well known that pollution controls on trucks deteriorate over time if they are not properly maintained.  A new 'clean' truck will become 'dirty' fairly soon without periodic, expensive maintenance."); Ex. 185 at LAD001209; Apr. 20 Tr. at 132:7-12 (Whelan). These actions would also be pursued by a profit-maximizing private company in the same circumstances, and the Court therefore finds them to be proprietary.

### 4.    Preemption by 49 U.S.C. § 14506(a)

ATA contends that the placard provision is separately preempted by another provision of the FAAA Act, 49 U.S.C. § 14506(a), which precludes state entities from requiring a motor carrier "to display any form of identification on or in a commercial motor vehicle . . . other than forms of identification required by the Secretary of

---

[18] While the market may provide some incentive for motor carriers to maintain their trucks in order to preserve their reputations, it is clear that some motor carriers have historically violated safety and maintenance regulations.  See Apr. 23 Tr. at 95:7-96:3; Ex. 185 at LAD001209 (study concluding that while heavy duty vehicles account for only 21.3% of vehicles in the Long Beach Harbor District, between January 1, 2005 and March 10, 2007, they accounted for 25.7% of accidents and 87.1% of citations issued for improper maintenance).  Moreover, even if the maintenance provision is duplicative of existing federal and state safety requirements, few motor carriers are actually inspected to ensure that they are meeting existing standards due to a lack of resources on the federal and state level, and the Court finds that any such redundancy reinforces these requirements.  See Apr. 28 Tr. at 20:2-21:21 (Hall).

Transportation." The Court finds that because the required placard is not a "form of identification," but instead merely lists a phone number, it is explicitly not preempted under the language of section 14506(a). See Apr. 23 Tr. at 126:19-127:9 (Holmes).

## D.   Castle v. Hayes

ATA renews its argument that the Concession Agreement is preempted because only the Federal Motor Carrier Safety Administration ("FMCSA") can revoke a licensed motor carrier's right to provide drayage services at POLA under Castle v. Hayes Freight Lines, 348 U.S. 61 (1954). The Supreme Court in Castle considered whether a state may bar interstate motor carriers from using state roads as punishment for repeated violations of state highway regulations. For the reasons set forth in this Court's order dated April 28, 2009, which granted in part and denied in part ATA's "motion on remand for entry of preliminary injunction of Counts I and II of complaint," the Court finds that the Concession Agreement is not preempted under Castle.

## E.   Dormant Commerce Clause

The Commerce Clause of the United States Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States." U.S. Const., art. I, § 8, cl. 3. The Commerce Clause also protects interstate commerce from local trade barriers. See Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 350 (1977). A Commerce Clause violation can be based on a finding of discriminatory impact or undue burden on interstate commerce. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). ATA argues that the Concession Agreement violates the Commerce Clause because (1) it imposes an undue burden on its members' ability to engage in interstate commerce, or (2) it is a *per se* undue burden on interstate commerce pursuant to 49 U.S.C. § 14504a.[19] The Court addresses each argument in turn.

------

[19] Because the Court concludes that the Port adopted its Concession Agreement in the exercise of its proprietary, and not its regulatory capacity, its actions fall within the market participant doctrine and are therefore protected from ATA's Commerce Clause (continued...)

**1.    Undue Burden Pursuant to the Dormant Commerce Clause**

The Dormant Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. v. Limbach, 486 U.S. 269, 273 (1988).  Courts therefore uphold regulations against "undue burden" Commerce Clause attacks "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Authority, 550 U.S. 330, 339 (2007) (quoting City of Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978)) (internal quotations omitted); see also Conservation Force, Inc. v. Manning, 301 F.3d 985, 995 (9th Cir. 2002).  However, the Dormant Commerce Clause does not protect individual economic actors from "prohibitive or burdensome regulations." Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 474 (1981) ("We stress[] that the Commerce Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations.").

ATA has failed to show that the Concession Agreement imposes any burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." See United Haulers Ass'n, Inc., 550 U.S. at 346.  ATA contends that the employee driver provision burdens interstate commerce because it compels motor carriers to abandon their preferred business model in order to continue providing customers with drayage service to and from the Port, and this would affect the nationwide operation of motor carriers.  See Patterson III -59:7-61:3.  Furthermore, ATA emphasizes the increased costs of Port drayage in shifting from an independent owner-operator model to that of employee drivers and those involved in paying an estimated $20,000 per truck to

[19](...continued)
challenge.  See Reeves, Inc. v. Stake, 447 U.S. 429, 435 n.7 (1980); Big Country Foods, Inc. v. Board of Educ. of Anchorage School Dist., 952 F.2d 1173, 1180 (9th Cir. 1992) ("If the State is acting as a market participant, rather than a market regulator, the Dormant Commerce Clause places no limitations on its activities.").  Nevertheless, the Court addresses the merits of defendant's Dormant Commerce Clause arguments.

secure off-street parking, which could affect interstate commerce in the form of higher prices to customers shipping goods interstate.[20] Ex. 183, "Husing Report," at 70-73. The Court agrees with ATA that it appears likely that economic burdens will be imposed on motor carriers by the employee driver and off-street parking provisions of the Concession Agreement. Indeed, the Husing Report concluded that the cost to motor carriers of using employee drivers would "be 167% higher than the cost of using today's [independent owner-operators]"; the BCG Report stated that its Clean Truck Program Option III, which included the requirement for employee drivers, would add $500 million in annual operating costs to the cost of Port drayage, compared to an option without such a requirement; and the Husing Report estimated that the cost of complying with the off-street parking requirement would average $21,237 per truck. Ex. 183, "Husing Report," at 70-73; Ex. 191, "BCG Report," at 80. However, ATA has not demonstrated that such economic burdens on motor carriers translate into impermissible or undue burdens on interstate commerce. Indeed, because drayage trucks transport less than 5% of the cargo that they pick up at POLA to points outside of California, the Court finds that any increase in drayage prices that is passed on to customers would predominantly affect commerce within California, rather than encumbering interstate commerce.

Even assuming, *arguendo*, that ATA could show that the Concession Agreement imposes a significant burden on interstate commerce, ATA has failed to show that this burden exceeds the putative local benefits. See United Haulers Ass'n, Inc., 550 U.S. at 346. To the contrary, the evidence shows that the local environmental, economic, safety, and security benefits of the Concession Agreement provisions at issue outweigh any burdens on interstate commerce. See Apr. 23 Tr. at 18:12-20:8; 21:22-22:22, "Testimony of Dr. Elaine Chang," (discussing the South Coast Air Quality Management

---

[20] ATA has put forth no evidence that the placard, maintenance, and financial capability provisions burden interstate commerce. Accordingly, the Court declines to make such a finding.

District ("SCAQMD") study that evaluated the emissions reductions that were expected to occur from the Clean Truck Program, including an estimation of 840 fewer premature deaths that could be avoided and a savings of $5.9 billion in health benefits); Ex. 239 at LAD001185, "October 2007 Executive Director's Report to the BHC"; Ex. 232; Ex. 191, "BCG Report," at 77 (concluding that the benefits to the local environment, port operations, vehicle and driver safety, and port security of the Port's adopted plan greatly exceeded the costs). Indeed, in addition to the Concession Agreement's estimated $4.7 to $5.9 billion in economic benefits to the local community resulting from a reduction in premature deaths, loss of work, and medical problems, it is estimated that the Port would support up to 600,000 new jobs that would be lost if the Port is not able to expand. See Ex. 183, "Husing Report," at vi. Some improvements to the air quality of the Port region have already been realized through the Concession Agreement requirements that have not been precluded from enforcement by the preliminary injunction currently in place.[21] The Court further finds that the local benefits of each Concession Agreement provision at issue continue to outweigh any burdens on interstate commerce, including local benefits such as reducing heavy traffic, pollution, and safety hazzards in local communities by requiring off-street parking; empowering local residents to report to Port authorities the unsafe driving, illegal parking, and environmental violations of trucks; ensuring that drayage trucks are well-maintained and thus operating safely by requiring regular maintenance; and confirming that concessionaires can financially afford to meet the Port's safety, security, and environmental standards.

### 2.    Unreasonable Burden under 49 U.S.C. § 14504a(c)

ATA further contends that the Concession Agreement provisions at issue

---

[21] ATA argues that the benefits of the Clean Truck Program can be achieved by less burdensome means, such as those imposed by the Port of Long Beach. However, the existence of less burdensome alternatives is irrelevant to the "undue burden" inquiry at hand, which is whether the Concession Agreement provisions at issue place a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." See United Haulers Ass'n, Inc., 550 U.S. at 346.

constitute an unreasonable burden *per se* under 49 U.S.C. § 14504a(c), which provides that:

> For purposes of this section, it shall be considered an unreasonable burden upon interstate commerce for any State or any political subdivision of a State, or any political authority of two or more States . . . to enact, impose, or enforce any requirement or standards with respect to . . . any motor carrier . . . in connection with . . . the annual renewal of the intrastate authority, or the insurance filings, of the motor carrier or private motor carrier, or other intrastate filing requirement necessary to operate within the state . . . ."

ATA argues that the requirement to execute a Concession Agreement with the Port is a necessary precondition to the right of federally licensed motor carriers to dray cargo at POLA, which is within the state of California, and thus that the Concession Agreement is preempted by 49 U.S.C. § 14504a.

The Court finds that ATA has not demonstrated that section 14504a preempts POLA's Concession Agreement.  Indeed, Congress disclaimed any intent to broadly preempt state action related to motor carriers, providing that, "[e]xcept as provided in [49 U.S.C. §§ 14504, 14504a, and 14506], this subtitle is not intended to prohibit any State or any political subdivision of any State from enacting, imposing, or enforcing any law or regulation with respect to a motor carrier . . . that is not otherwise prohibited by law."  Unified Carrier Registration Act of 2005, Pub. L. No. 109-59, § 4302, 119 Stat. 1761, 1761.  Congress adopted section 14504a as part of the Unified Carrier Registration Act of 2005, which replaced one central repository for information relating to motor carriers, the Single State Registration ("SSR"), with another, called the Uniform Carrier Registration System ("UCRS").  See 49 U.S.C. § 13908.  The UCRS centralizes information regarding motor carriers, with the intent that such carriers can, by registering their operations in one state, operate in every other state that participates in the UCRS.  In section 14504a, Congress directed the Secretary of Transportation to

develop uniform yearly filing and fee requirements for the UCRS.  49 U.S.C. § 14504a(d)(2), (7).  Thus, section 14504a preempts a state's authority to impose additional fees or regulations—related to registering a motor carrier's operations so that it can operate within the state—beyond those developed by the Secretary.  See Mid-Con Freight Sys., Inc. v. Mich Pub. Serv. Comm'n, 545 U.S. 440, 447-51 (2005) (explaining the rationale for and the limits of preemption under the SSR).  Indeed, the portion of section 14504a upon which ATA relies addresses only the ability of states to enforce requirements related to motor carriers' authorization to "operate within the State" in question.  See 49 U.S.C. § 14504a(c)(1)(D).

POLA's Concession Agreement does not fall within the scope of section 14504a, because it does not impose additional regulations related to registering a motor carrier's operations so that it can operate "within the state" beyond those developed by the Secretary of Transportation.  First, drayage truckers do not have to sign the Port's Concession Agreement to operate in California; instead they can operate anywhere in California, including at other ports within the state, without signing POLA's Concession Agreement.  Instead, the agreement merely addresses the ability of drayage trucks to enter the Port's own private property for business purposes, not to drive generally on public highways.  Second, POLA does not transmit the information it collects to UCRS, and thus does not interfere with motor carriers' federal authorization to operate within the state.  Finally, California has expressed no intention to withhold intrastate operating authority absent compliance with POLA's Concession Agreement.  Because the Concession Agreement has no effect on state registration requirements related to the UCRS, section 14504a is not relevant to this action.  Accordingly, the Court concludes that the Concession Agreement does not constitute a burden on commerce under section 14504a.

## IV.   CONCLUSION

Based on the foregoing, and after careful consideration of the record in this case, the Court concludes as follows:

- The employee driver provision and the off-street parking provision of POLA's Concession Agreement are "related to [motor carriers'] price, route, or service," and thus fall under the FAAA Act, but the maintenance provision, the placard provision, and the financial capability provision are not.

- The Tidelands exception does not apply to exempt the Concession Agreement from preemption by the FAAA Act.

- The maintenance provision and the placard provision of the Concession Agreement fall under the safety exception to the FAAA Act, but the employee driver provision, the off-street parking provision, and the financial capability provision do not.

- The Concession Agreement provisions fall within the ambit of the market participant exception to the FAAA Act.

- The placard provision is not separately preempted by 49 U.S.C. § 14506(a).

- The Concession Agreement is not preempted pursuant to Castle v. Hayes Freight Lines, 348 U.S. 61 (1954).

- The provisions of the Concession Agreement at issue do not constitute an undue burden on interstate commerce pursuant to the dormant Commerce Clause.

- The provisions of the Concession Agreement at issue do not constitute an unreasonable burden on interstate commerce under 49 U.S.C. § 14504a(c).

Based on the foregoing, the Court awards judgment in favor of defendants City of Los Angeles, Harbor Department of the City of Los Angeles, and Board of Harbor Commissioners of the City of Los Angeles.  Defendants are directed to prepare a form of final judgment in accordance with the Rules of this Court.

IT IS SO ORDERED.

Dated: August 26, 2010

CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE